# In the United States Court of Federal Claims

No. 09-273T

(Filed under seal:  July 31, 2013)

Reissued:  August 22, 2013[1]

_____

|  |  |
|---|---|
| DESERET MANAGEMENT CORPORATION, | *  *  *  *  *  *  *  *  *  *  *  * |
| Plaintiff, | Tax refund claim; Trial; Exchange of radio stations; Like-kind exchange – section 1031 of the Code; Goodwill – qualitative and quantitative aspects; Significant goodwill not transferred in exchange of radio stations; Class lives of depreciable property – sections 167 and 168 of the Code; Air conditioning equipment reclassified; Other assets received proper class lives; Refund process established. |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

_____

## OPINION
_____

*Eric C. Olson*, Kirton & McConkie, Salt Lake City, UT, for plaintiff.

*Benjamin C. King, Jr.*, Tax Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Kathryn M. Keneally*, for defendant.

**ALLEGRA, Judge:**

This tax refund case is before the court following trial in Washington, D.C.  There are two distinct issues presented in this case.  The first involves the tax treatment of a swap of radio stations that occurred in 2000.  More specifically, at issue is whether the agreed upon value of radio station KZLA-FM (KZLA), the Los Angeles station that plaintiff swapped in that transaction, included any component for goodwill.  Plaintiff claims that the station, which was the only country station in Los Angeles at the time, possessed no appreciable goodwill; defendant contends otherwise.  If plaintiff is correct, no additional taxes were owed on the swap,

_____

[1]  An unredacted version of this opinion was issued under seal on July 31, 2013.  The parties were given an opportunity to propose redactions, but no such proposals were made.  Nevertheless, the court has incorporated some minor changes into this opinion.

which otherwise qualified as a like-kind exchange under section 1031 of the Internal Revenue Code.[2]  If defendant is right, the portion of the value of KZLA allocated to goodwill is taxable as capital gain.  The second issue herein involves whether assets that were placed in service between 1988 and 2000 are properly classified as non-residential buildings (or structural components thereof) or, instead, property used in radio broadcasting.  Resolution of this issue affects the class lives of this property, thereby impacting the calculation of depreciation allowances under section 168 of the Code.

Based on its review of the record, and for the reasons that follow, the court finds that: (i) for purposes of the like-kind exchange provisions of section 1031 of the Code, plaintiff did not transfer appreciable goodwill as part of the KZLA exchange; and (ii) with the exception of certain air conditioning equipment, plaintiff has failed to demonstrate that the assets in question were improperly treated as non-residential buildings (or structural components thereof) for purposes of their depreciation under section 168 of the Code.  Procedures for the issuance of an appropriate judgment are established.

## I.    FINDINGS OF FACT

Based upon the record, including the stipulation of facts, the court finds as follows:

Plaintiff, Deseret Management Corporation (Deseret or plaintiff), is a Utah corporation and a holding company for various subsidiaries.  The latter include Bonneville International Corporation (BIC), which owns and operates radio stations in large markets throughout the United States.  From 1998 to 2000 (the relevant time period), Bruce Reese was the president and Chief Executive Officer (CEO) of BIC.  In tandem with a sister company, Bonneville Holding Company (BHC), BIC was in the business of owning and operating radio stations.  Often, in purchasing a radio station, BHC would acquire and hold the station's Federal Communications Commission (FCC) license,[3] while BIC would acquire and hold the remainder of the station's assets.  In these situations, BIC operated the radio station and paid royalties to BHC for use of the license.

---

[2]  All references herein are to the Internal Revenue of 1986 (26 U.S.C.), as amended and in force during the years in question.

[3]  Since 1934, the FCC has managed the electromagnetic spectrum that each radio station uses.  In any geographic area, there are a finite number of frequencies on which a radio station can broadcast without signal interference.  *See Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 566-67 (1990); *Red Lion Broadcasting v. FCC*, 395 U.S. 367, 375-77 (1969).  The lawful operation of such a station in the United States requires an FCC license, which assigns a defined coverage area, call letters, a transmitting power, a transmitting location, a band and class of service (AM or FM and Class A FM or Class B FM) and, for FM stations, an antenna height.  An FM station's signal coverage is, in part, a function of the location and elevation of the station's transmitting antenna (referred to as its "height above average terrain" or HAAT) and its transmitting power (referred to as its "effective radiated power" or ERP).

## A.  KZLA – Goodwill

On April 3, 1998, BIC and BHC exchanged certain assets of radio station KBIG-FM with Chancellor Media Corporation for those of KZLA.  Both stations broadcast in the Los Angeles, California radio market (the LA Market).  Consistent with the pattern described above, BHC acquired KZLA's license, while BIC acquired all of the station's other assets.  After acquiring KZLA, BIC kept the country format.  From 1998 to 2000, David Ervin was the general manager of KZLA, and Richard Meacham its President.  In 1998 and 1999, KZLA's revenue was $17.25 million and $16.57 million, respectively.  In 2000, revenue was approximately $16.4 million.[4]

KZLA was the only FM station that used a country music format in the LA Market between 1998 and 2000.  Because this case turns upon a determination of what, if any, "goodwill" KZLA possessed in 2000, it is necessary to review some basic facts about the radio business and the LA Market.

During the time in question, Los Angeles was the second largest radio market in the country, and it was growing rapidly.  Population in the LA Market grew from 13.2 million in 1998 to 13.6 million in 2000.  Gross revenues for radio stations expanded from between $648.4 million and $658.2 million in 1998, to between $851 million and $914 million in 2000.  By 2000, there were seventy stations in the market:  seventeen Class A FM signals, twenty-two Class B FM signals, and thirty-one AM signals.  FM signals tend to have greater clarity and coverage than AM signals.  Within FM stations, Class A signals serve smaller areas or communities and have smaller coverage than Class B signals, which tend to cover larger metropolitan areas.  One financial analyst reported that in 2000, only twenty-one of the LA stations were "viable FMs," that is, FM stations with ratings sufficiently "significant" to be considered "serious competitors."

In Los Angeles, the mountainous terrain adversely impacts the broadcast coverage of FM signals.  This topography gives certain radio stations in the LA Market a few advantages over their competitors.  The first of these, for some of these stations, is antenna location:  the antenna farm located on Mt. Wilson offers the most elevated place in the LA Market from which to broadcast a radio signal.  In 2000, of the approximately forty FM stations that were licensed to broadcast in the LA Market, only fourteen were licensed to transmit from this peak in the San Gabriel Mountains, including KZLA.  A second advantage is enjoyed by stations that are exempt from FCC restrictions (dating to 1963) which limit the power stations can use to broadcast signals from elevated antenna locations such as Mt. Wilson.  Seventeen Los Angeles FM stations were "grandfathered in" under those regulations because they were using power exceeding the

---

[4]  Actual revenue data for all of 2000 is unavailable, but through October 31 of that year, revenue was $11.2 million.  Duncan's Radio Market Guide, a source of information about the commercial radio industry that reports station revenues, estimated the year's total revenue to be $16.4 million.  Duncan's estimates for 1998 and 1999 were within $650,000 and $370,000 of KZLA's actual revenue figures, respectively, lending some credence to the 2000 estimate.

restrictions when they were promulgated in 1963.  KZLA, a Class B FM station broadcasting at a frequency of 93.9, was one of those 17 "superpower" stations.  Its signal covered approximately 6,400 square kilometers, capable of reaching a population of more than 12.7 million listeners.

Like much of the country, the LA Market was dramatically impacted by the passage of the Telecommunications Act of 1996 (the Telecommunications Act).  Prior to 1996, the FCC limited the number of stations that could be owned by a single entity in both a given market, as well as nationwide:  a single entity could not own more than three AM stations and three FM stations in a large market such as Los Angeles, nor could it own more than thirty AM stations and thirty FM stations nationally.  The Telecommunications Act relaxed these limits.  After 1996, in a large market, like Los Angeles, a single entity could own up to eight commercial radio stations, so long as no more than five of them were either AM or FM.  National ownership limitations were eliminated entirely.  These changes prompted major consolidations within the radio industry – for instance, in March 1996, the two largest radio groups, Clear Channel and Jacor held 113 stations between them; by March 2001, they owned more than 1,200 stations. The Telecommunications Act also prompted owners to sell stations in one market and acquire them in another, seeking to consolidate their holdings.[5]  Consolidations like these occurred in the LA Market.  Some of the transactions took the form of so-called "stick" transfers, in which the only thing the buyer desired was the FCC license (and associated dial position), the transmitter, and the tower/antenna – what one witness referred to as a "ticket to play in that market."  In 1995, the three largest radio station owners in the area (CBS, Cox, and Infinity) owned nine FM and AM radio stations; by 2000, the then three largest owners (Clear Channel, Infinity, and Hispanic) controlled 22 stations.

During this same time, Spanish-language broadcasting blossomed as a driving economic force in the LA Market, with broadcasters in this genre showing an intense demand for LA stations with strong FM signals.  This demographics-inspired sea change, combined with the Telecommunications Act's relaxation on ownership limits, created a demand for FCC licenses and radio stations that outpaced supply.  Not surprisingly, prices for radio stations increased astronomically during this period.

---

[5]  One of plaintiff's witnesses, Mary Beth Garber, who was once President of the Southern California Broadcasters Association, testified that after the passage of the Telecommunications Act:

> A number of groups realized that they could use scale, the scale of mass, to become more efficient and also to become more effective, that they could translate a lot of their expertise into shares in markets other than where they were and expand their footprint in the markets where they were.

> At that point we basically developed players and non-players.  And people looked at where they were in a marketplace and determined whether it was worth it for them to stay there and try to acquire more stations or if it made more sense for them to sell what they owned to someone else and get out of dodge and basically go someplace else and consolidate their hold in that market.

A radio station is in the business of selling time to advertisers that are attempting to reach the station's listeners. Advertisers are interested in the size and demographics of a radio station's audience. Because listeners are drawn by the "format" of a radio station, a station may target specific demographics for their listener base by playing the music or other content it believes will appeal to those individuals. The station then looks to sell time to advertisers interested in reaching listeners within those demographics. The majority of radio advertising time is sold to advertising agencies, which buy on behalf of companies.

Several metrics are used to gauge the success of a radio station. One of these is market share. Arbitron is a nationally-recognized radio audience research firm. At the end of 2000, it had designated 278 different local geographic areas, or "Metros," in an attempt to reflect the audiences reached by local radio stations. One of these Metros was the LA Market, consisting of Los Angeles and Orange Counties, California. During the relevant time period, Arbitron reported the percentage of all radio listening in each Metro area. It did so by sampling the total persons twelve or older listening to the radio Monday through Sunday, 6:00 am to midnight. A station's percentage of all radio listening is referred to as its "audience share." Sometimes this share is adjusted to compare a station's audience to all commercial radio audiences in the market – the "adjusted share."

Duncan's Radio Market Guide reported that revenue for stations in the LA Market rose from $648.4 million in 1998 to $914 million in 2000. As reported in various Duncan publications, between 1985 and 2001, retail sales in the LA Market grew at a compound annual rate of 5.2 percent; between 1994 and 2000, radio station revenue in the LA Market grew at a compound annual rate of 12.2 percent. By comparison, from 1998 to 2000, KZLA's revenue stayed relatively flat, at approximately $16 million per year. According to Duncan, KZLA's adjusted audience share in 1998 was 2.6, which was the twentieth best share out of the thirty-five stations covered in the Duncan report for Los Angeles. In 1999, the share dropped to 2.4 (20th of 39), and in 2000, it went back up to 2.6 (17th of 39). Another indicator of station success is revenue share, which is calculated by dividing a station's revenue by the total gross radio revenue in the market. KZLA's revenue share was 2.6 in 1998, 2.1 in 1999, and 1.8 in 2000.[6]

Finally, a radio station's "power ratio" is obtained by dividing its revenue share by its adjusted audience share. The higher the power ratio, the better a station is performing – suggesting either a superior performance in marketing the station to advertisers or an unusually desirable demographic. A power ratio of 1.0 indicates that the station is attracting the same share of advertiser spending as its share of the market audience. In some situations, the power ratio exceeds 1.0 by enough to make the station a "must buy" or "top tier"– a station so desirable that

---

[6] The report of Mr. Bond, one of plaintiff's experts, does not list rankings for revenue shares in the LA Market, but does set forth rankings for raw revenue. In this ranking, KZLA was reportedly 18th of 34 in 1998, 22nd of 35 in 1999, and 22nd of 40 in 2000. The numbers of stations in the revenue rankings do not align exactly with the numbers of stations in the audience share rankings. There is no explanation for this minor discrepancy.

an advertising agency would be doing its clients a disservice if it did not purchase advertising.[7] Conversely, a ratio below 1.0 indicates either that the station is doing a less than adequate job in marketing itself or has a less desirable audience. In 1998, KZLA had a power ratio of 1.0. In 1999, KZLA's power ratio fell to 0.88, and in 2000, it dropped further, to 0.69. Accordingly, as noted in various testimony, at a time where revenue in the LA Market was growing, KZLA's power ratio was shrinking.

In late 1999, Mr. Ervin (KZLA's general manager) hired Coleman Research (Coleman) to study KZLA's performance. Coleman does research and marketing for various media companies, primarily radio stations. Pursuant to that contract, Chris Ackerman, a vice president of Coleman, performed a "perceptual study" of KZLA in December 1999, designed to determine audience perception of the station, "brand image position," and how to improve audience share.[8] Data for the study was developed through a survey instrument that a third party used to conduct telephone interviews with a representative, random set of listeners – approximately 500 people were surveyed.[9] In January 2000, Coleman presented the results of its study and a set of recommendations to Mr. Ervin and BIC. Its report found that KZLA listenership was "under-developed," that KZLA suffered from weak formatting, that the station lacked brand depth beyond music,[10] and that the on air personalities were "not particularly compelling."[11] In this

---

[7]   On this point, Ms. Garber used the example of a Honda passenger van. She suggested that advertisers seeking to sell such vans would target women 25-54 years of age, who tend to have children to transport. Regarding this example, she noted that "[i]f you're after women 25-54 years of age there are several radio stations in the market that have a significant enough share of those women that you must buy them or you'd really better be in a position where you can explain to your client why you didn't." Ms. Garber indicated that in such an instance, the advertising agency would issue a request for proposals, indicating that it is going to buy a certain number of rating points against women 25 to 54 at a specified price per rating point. Responses to the request from radio stations would indicate how the desired demographic would be served.

[8]   Mr. Ackerman had considerable experience in the radio business – he had worked for 14 years in the business before joining Coleman and had been a vice president at Coleman since 1992.

[9]   Among the areas covered by the survey were: which radio stations can you list off the top of your head; which radio station do you listen to the most; total time spent listening to radio; which country music station is preferred; and preferences among country music fans in terms of whether they preferred classic or contemporary.

[10]   As defined by Mr. Ackerman at trial, "brand depth" "refers to the nonmusic brand elements that successful stations typically have," and includes things like "morning show, personalities, games and contests, concerts, parties, events, community involvement." The Coleman report found that even the station's loyal users did not perceive that the station had such elements to stimulate them to use the station more frequently.

regard, the report indicated that "[w]hile the overall appetite for the Country format in Los Angeles is somewhat lower than Coleman Research typically observes nationally, it still has the potential to fuel a Top 5 25-54 rank position for KZLA, provided it can develop strong, dominant ownership of the Country format image position." Consistent with this view, the report found that KZLA's existing audience was "relatively loyal and committed to the station," as reflected by strong figures indicating that the station was the "absolute favorite" among country listeners. The report concluded that there was an unrealized potential for the country format – specifically that "there are Country share points being left on the table" – and that there was potential for KZLA to "grow another full share point above its current ratings range." The report concluded with eleven recommendations designed to realize KZLA's full potential, particularly focusing on aggressive external marketing.[12]

In early 2000, Mr. Reese negotiated a deal with Emmis Communications (Emmis) in which Emmis would acquire KZLA's assets. Emmis is an Indianapolis-based company that owns and operates radio and magazine entities throughout the country. In 2000, it owned approximately twenty radio stations, including KPWR-FM, a Class B FM station in Los Angeles. It also owned or had the right to acquire four stations in the St. Louis radio market – WRTH-AM, WIL-FM, WVRV-FM, and WKKX-FM (the St. Louis Stations). Jeff Smulyan was the president and CEO of Emmis; Doyle Rose was the president of Emmis Radio, a division of Emmis. Reese and Smulyan agreed to exchange the assets of the St. Louis Stations for the assets of KZLA. These assets included the respective FCC licenses for each of the radio stations.

On April 19, 2000, Mr. Reese briefed BHC regarding the progress of negotiations with Emmis. In a letter, he explained that BHC and BIC would give up KZLA, which, according to Mr. Reese, had increased in fair market value from the time it was acquired – from $155 million to between $225 and $250 million. The letter listed the principal hard assets of KZLA as the office building ($2.5 million), owned antenna and towers, and a leased transmitter site. The letter further noted that KZLA's cash flow was approximately $6.5 million in 1999 and $6.6 million in 2000. In exchange, BIC and BHC would acquire three or four St. Louis stations; depending on the stations provided, and their cash flows, there would also be an exchange of cash between the companies. "At the one extreme," Mr. Reese explained, "Emmis might end up giving [BIC and BHC] three stations plus $25-$35 million in cash. At the other end, [BIC and BHC] could get four stations and pay up to $25 million in cash." Mr. Reese asked BHC to

---

[11]   Most of these findings were supported by statistics. For example, one finding was that only 18 percent of 25-54 year-olds associated the country format with KZLA. The report stated that "[t]ypically, well-positioned Country stations achieve 25%-35% market images." Further, the report found that only 50 percent "of those expressing a Core Interest in the Country format associate KZLA with the Country format image," noting, by comparison, that "[n]ormally, successful Country stations achieve 70%-80% format fit among Country format fans."

[12]   These recommendations ranged from marketing points designed to strengthen the station's format and music image position; to ways to leverage KZLA's position better with the country music industry; to revamping KZLA's roster of on-air personalities.

authorize BIC management to proceed with negotiations, and recommended that tax advisors from both BIC and BHC review the structure of the proposed transactions.

On April 28, Mr. Reese wrote Messrs. Smulyan and Rose at Emmis outlining a proposal for exchanging the assets of KZLA for the assets of the St. Louis Stations.  In this letter, Mr. Reese assessed that "the value of KZLA is well north of $200 million. . . . In fact, I suspect it might go for as much as $240-$250 million on the open market.  This presumption is based on unsolicited but relevant inquiries since November, from both general market and Hispanic operators."  However, because St. Louis was an "attractive opportunity," he concluded that "something less than an auction price is the right place for us to value KZLA."  At trial, Mr. Smulyan testified that, during the negotiations, he did not believe that KZLA was worth as much as Mr. Reese thought and that Emmis viewed the transaction as acquiring a "stick" for an entry price.

On June 21, 2000, BIC, BHC, and Emmis executed a letter of intent setting forth the terms under which the exchange would occur.[13]  On October 6, 2000, they executed an Asset Exchange Agreement (the Agreement), in which they agreed to exchange the assets of KZLA for those of the St. Louis Stations.  In the Agreement, the signatories agreed that the exchange value of the assets on both sides was $185 million.  A section in the Agreement described the assets exchanged and discussed the "allocation of asset values."  In this section, the companies agreed that "the fair market value of the [assets] shall be determined and allocated on the basis of an appraisal (the Appraisal) prepared by [BIA Consulting, Inc.]."  The parties agreed to file any income tax schedules or forms required by the Internal Revenue Service (IRS, or the Service) in conformity with the Appraisal.  The parties to this litigation have further stipulated that as of October 6, 2000, the value of all tangible assets of KZLA was $3,384,637, and that the value of all intangible assets of KZLA, apart from the FCC License and any goodwill, was $4,858,317.

As the Agreement envisioned, BIA performed an appraisal of the assets of KZLA as of October 6, 2000.  That appraisal was completed and delivered after the transaction closed.  BIA concluded therein that KZLA had a "Going Concern Value" of $156,000 and that its FCC license was worth $176,757,046.  As used in the BIA report, going concern value included the value of KZLA's preexisting systems and procedures for finances, administration, technology, and sales, and "allows for the continued successful operation of the station."  BIA valued KZLA's going concern as the "cost that would be required to replicate the systems and procedures in place and in use at the station."  It calculated the value of the FCC license using the residual fair market value method – it subtracted the value of all other assets (tangible and intangible) from the exchange value (the $185 million), and assigned the difference (the residual) to the FCC license.  BIA assigned no value to goodwill because: (i) as a matter of case law, "[i]t is well-established that broadcast stations do not possess any goodwill;" (ii) broadcast stations in general "do not

---

[13]   The transaction was to close at a later date pending FCC approval of the deal and the resolution of litigation Emmis had with Sinclair Communications, Inc.  On July 31, 2000, BIC and Emmis entered into Time Brokerage Agreements that allowed Emmis to begin operations in Los Angeles before the deal closed.

enjoy any goodwill in the sense of either listener or advertiser loyalty;" and (iii) KZLA, in particular, "does not possess any other traditional manifestations of goodwill."[14]

Following the transfer, Emmis continued to maintain KZLA's country format (and did so until sometime in 2006).[15]  While it retained the program director and most of the sales staff, Emmis terminated all but one of the on-air personalities at the station.  It modified the music mix in the country format, shifting from more traditional to contemporary country music.  And it added various brand depth elements.  Emmis also had access to the Coleman report and began, in consultation with Coleman, to implement some of the recommendations in that report.

For each of the tax years 2000 through 2002, Deseret timely filed a consolidated federal income tax return on behalf of itself and its subsidiaries, including BIC.  In 2000, Deseret reported the above-described exchange as a "like-kind" exchange and recognized gains owing to the exchange.  It based its report of gains on the BIA appraisal, and therefore assigned no value to goodwill.  Following an audit, on February 28, 2005, the IRS proposed an adjustment in Deseret's 2000 tax year with respect to the reporting of gain from the exchange.  The IRS determined that KZLA possessed goodwill with a value of $73,311,046 on the date of the exchange.  On May 6, 2005, the IRS issued to Deseret a thirty-day letter (IRS Form 950) with respect to tax years 2000 through 2002, which asserted a deficiency regarding 2000 and

--------

[14]   In his testimony at trial, the individual who performed this allocation, Geoffrey Price, agreed that "no part of [his] analysis . . . was designed to ascertain the value of goodwill because [he] operated under the assumption that because [he was] dealing with a radio station that there was no such thing."  In assigning values to intangible assets, Mr. Price also did not assign a value to KZLA's assembled workforce or to any name recognition associated with the station's call letters.

[15]   In describing the rationale for this decision, Mr. Smulyan testified:

I think it was based on three things, one it was based on the research that we had done, Coleman, and I'm sure we did independent research of Coleman.  I know that we always tore apart the market . . . .  So we looked at the demographic and psychographic trends.  I think we based it on the fact that there was an outpouring of potential support from the country music community who felt that they needed to provide significant support to the format in Los Angeles.

And I think we looked at it and said we weren't absolutely certain that there was an alternative format that was going to be a top-five station.  I think if we had said there is a format that we know will be top five we would have blown it up, absolutely, positively.  And I'm certain that there was nothing in the Coleman report that told us this was a major radio station.  I think they said if you do the following things you can improve its rank and position.

incorporated the conclusions previously set forth with respect to the value of the goodwill of KZLA.

In early 2008, Deseret and the IRS jointly executed an IRS Form 870-AD, on which Deseret agreed to the assessment and collection of deficiencies for the tax years in question, but also reserved "the right to timely file a claim for refund or credit or prosecute a timely claim." On December 15, 2008, Deseret did just that – it filed with the IRS an Amended U.S. Corporation Income Tax Return, Form 1120X (Claim for Refund) for the tax year 2000, seeking refund of what it alleged was an overpayment of $25,572,074, plus interest. On February 19, 2009, the IRS fully disallowed each item claimed in the Claim for Refund. On March 4, 2009, Deseret executed IRS Form 2297 – Waiver of Statutory Notification of Claim Disallowance and Form 3363 – Acceptance of Proposed Disallowance of Claim for Refund or Credit – and sent them, along with a letter, to the IRS. In these documents, Deseret acknowledged the IRS's disallowance of their claim, but expressly preserved its right to bring an action for refund of the disputed tax assessments.

### B.      Depreciation – Class Lives

The thirty-two assets at issue were placed into service by plaintiff between 1988 and 2000. These assets were originally classified by plaintiff as buildings or structural components of buildings, depreciable as nonresidential real estate over 39 or 31.5 years. Four of the assets are buildings which were used by BIC to store equipment and to house its transmitters. The other assets were air conditioning equipment and duct work; electrical wiring; partitions, walls, ceilings, windows, and millwork; and other leasehold improvements.

In 2002, BIC retained the accounting firm Deloitte and Touche (Deloitte) to review its fixed asset records and determine whether BIC was depreciating assets correctly. John Seabrook was the Deloitte partner primarily responsible for conducting the study. BIC provided Deloitte with an electronic download of its fixed asset records, which contained information on each of BIC's approximately 18,600 fixed assets. Those records described each asset, the date on which it was placed in service, the asset's location, its cost, and information regarding the depreciation of the asset, including original life and accumulated depreciation data. This data came from Capital Asset Addition Forms, which were completed by the BIC employee who had acquired the asset, and then submitted to BIC's corporate office for entry into the Fixed Asset System. In addition to reviewing this information, Mr. Seabrook viewed some assets and had conversations with BIC employees about others. At the end of his study, he concluded that BIC had been claiming less depreciation than was allowable under the Code with respect to 158 specific assets which had been placed into service between 1988 and 2000.

On or about September 10, 2002, Mr. Seabrook assisted BIC/Deseret in preparing and submitting an IRS Form 3115 – Application for Change in Accounting Method – to request a change in the method by which Deseret depreciated these assets, beginning in tax year 2001. The IRS and plaintiff agreed on the treatment of the wide majority of these assets, but disagreed as to the proper treatment of thirty-two of the assets described above. At Deloitte's suggestion, BIC reclassified them into one of two groups: (i) assets used in radio and television broadcasting

as described in Asset Activity Class 48.2 of Revenue Procedure 87-56, 1987-2 C.B. 674, depreciable over five years, or (ii) office furniture and fixtures, and equipment included in Asset Class 0.11, also of Revenue Procedure 87-56, depreciable over seven years.

*       *       *       *       *

On April 29, 2009, Deseret filed this refund suit against the United States for recovery of income tax payments including, *inter alia*, those paid relating to the KZLA exchange and those relating to proper class lives of the BIC assets. Discovery was completed in May 2011. Trial in this case was held between February 23, 2012, and March 1, 2012.[16] Closing arguments were heard November 20, 2012.

## II.  DISCUSSION

In a refund suit, the assessment made by the IRS is presumed to be correct, placing an obligation on the taxpayer to come forward with evidence to rebut a presumption of correctness. *United States v. Janis*, 428 U.S. 433, 440-41 (1976); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Viewed in these terms, the presumption of correctness "is a procedural device which requires the taxpayer to come forward with enough evidence to support a finding contrary to the Commissioner's determination." *Rockwell v. Comm'r of Internal Revenue*, 512 F.2d 882, 885 (9th Cir. 1975), *cert. denied*, 423 U.S. 1015 (1975). In addition, a taxpayer in a refund suit also has the burden of proof – the ultimate burden of proving not only that it overpaid its taxes, but also the amount of the overpayment. *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935); *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932); *Am. Airlines, Inc. v. United States*, 204 F.3d 1103, 1108 (Fed. Cir. 2000).

This case presents two distinct issues. The first involves the proper treatment of the KZLA exchange under the like-kind exchange provisions of section 1031 of the Code. The second focuses on the proper classification of certain assets under the depreciation rules provided by sections 167 and 168 of the Code. The court will consider those claims *seriatim*.

### A.  KZLA – Goodwill

Under section 1031 of the Code, a taxpayer may defer recognition of gain or loss from qualifying exchanges of like-kind property. 26 U.S.C. § 1031(a). A like-kind exchange occurs if property held for productive use in a trade or business or for investment is exchanged solely for

---

[16] Using a practice employed by the United States Tax Court, *see* Tax Ct. R. 143(g), at trial, the court received the experts' reports in lieu of live expert testimony. This practice was adopted by the court at the Rule 16 conference, at the outset of discovery, in order to give the parties fair warning of its use prior to the time their experts generated their reports. Live examination of the expert witnesses began with cross-examination. The use of this practice saved considerable trial time. *See* Samuel R. Gross, "Expert Evidence," 1991 Wis. L. Rev. 1113, 1215-16 (advocating this approach).

property of like kind that is to be held either for productive use in a trade or business or for investment. *Id.*; *see also* 3 Michael D. Houser, Mertens Law of Federal Income Taxation § 20B:1 (2013) (hereinafter "Mertens"). Such an exchange allows the exchanger to delay recognizing gain on the exchanged property, as the tax basis of that property carries forward to the newly-acquired property. 26 U.S.C. § 1031(d); *see also Ocmulgee Fields, Inc. v. Comm'r of Internal Revenue*, 613 F.3d 1360, 1364 (11th Cir. 2010); *Morton v. United States*, 98 Fed. Cl. 596, 603 (2011).[17] However, a taxpayer recognizes gain in a like-kind exchange under section 1031 to the extent of the fair market value of any nonqualifying property exchanged. *See* 26 U.S.C. 1001. In this regard, Treas. Reg. § 1.1031(a)-2(c)(2) provides that "[t]he goodwill or going concern value of a business is not of a like kind to the goodwill or going concern value of another business." *See also Beeler v. Comm'r of Internal Revenue*, 73 T.C.M. (CCH) 1982, 1987 (1997); Mertens, *supra*, at § 20B:1.[18]

"Goodwill" is neither specifically referenced in section 1031 of the Code, nor defined in any Treasury Regulation thereunder. The term is employed elsewhere in the Code, most notably section 197, dealing with the amortization of intangible assets.[19] The regulations under that section define "goodwill" as "the value of a trade or business attributable to the expectancy of continued customer patronage," which expectancy may be due "to the name or reputation of a trade or business or any other factor." *See* Treas. Reg. § 1.197-2(b)(1). This definition "falls strictly in line with two centuries of the classic common law understanding of the term 'goodwill.'" Kelly M. Haggar, "A Catalyst in the Cotton: The Proper Allocation of the 'Goodwill' of Closely Held Business and Professional Practices in Dissolution of Marriages," 65 La. L. Rev. 1191, 1217 (2005). Courts grappling with the concept of goodwill have often done so in tax cases, with the definitions in that setting having dimensions that are both qualitative (*i.e.*, focusing on characteristics of goodwill) and quantitative (*i.e.*, focusing on arithmetic calculations indicating the existence of goodwill). *See* Eric J. Skytte, "Changing the Rules, but Not the Goodwill Game: *Newark Morning Ledger* in the Wake of I.R.C. Section 197," 21 Wm. Mitchell L. Rev. 485, 489 (1995).

---

[17] As noted by a prominent commentator, "[t]he statutory nonrecognition of gain or loss in the case of property held for productive use or investment has remained essentially unchanged since 1924." Mertens, *supra*, at § 20B:2.

[18] "Congress afforded nonrecognition treatment to § 1031(a) like-kind exchanges because it recognized that when a taxpayer merely exchanges one investment property for a similar investment property, the taxpayer has not cashed in on his investment but continued that investment, albeit in a different property." *Ocmulgee Fields*, 613 F.3d at 1364; *see also Starker v. United States*, 602 F.3d 1341, 1342 (9th Cir. 1979).

[19] Section 197 entitles taxpayers to claim "an amortization deduction with respect to any amortizable section 197 intangible." 26 U.S.C. § 197(a). Section 197(d)(1)(A) defines the term "section 197 intangible" to include, among other things, "goodwill." *Id.* at § 197(d)(1)(A); *see generally, Recovery Grp., Inc. v. Comm'r of Internal Revenue*, 652 F.3d 122, 125-26 (1st Cir. 2011).

Qualitatively speaking, goodwill has been defined in the case law as "the expectation of continued patronage." *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555-56 (1993) (quoting *Boe v. Comm'r of Internal Revenue*, 307 F.2d 339, 343 (9th Cir. 1962)).[20] Approximately 150 years earlier, Justice Story bundled together many of the indicia of goodwill in the following oft-quoted definition, *to wit*, that goodwill is –

> the advantage or benefit, which is acquired by an establishment . . . in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices.

Joseph Story, Partnerships § 99 (1841); *see also Des Moines Gas Co. v. Des Moines*, 238 U.S. 153, 165 (1915) (goodwill is "that element of value which inheres in the fixed and favorable consideration of customers, arising from an established and well-known and well-conducted business); *Metro. Nat'l Bank of N.Y. v. St. Louis Dispatch Co.*, 149 U.S. 436, 446 (1893) (relying on the Story definition).  Goodwill thus "provides a useful label with which to identify the total of all the imponderable qualities that attract customers to the business." *Newark Morning Ledger*, 507 U.S. at 556; *see also L.A. Gas & Elec. Corp. v. R.R. Comm'n*, 289 U.S. 287, 313 (1933).

Searching for more clarity, courts have also defined goodwill in quantitative terms, with an eye towards value.  Thus, the Supreme Court, relying on the Story definition quoted above, has described goodwill as the value "beyond the mere value of the capital, stock, funds, or property employed therein" associated with continued patronage.  *Newark Morning Ledger*, 507 U.S. at 555 (quoting *Metro. Nat'l Bank*, 149 U.S. at 446); *see also Baker v. Comm'r of Internal Revenue*, 338 F.3d 789, 793 (7th Cir. 2003); *Globe Life & Accident Ins. Co. v. United States*, 54 Fed. Cl. 132, 136 (2002).  Accordingly, in setting the value of goodwill as an intangible asset, goodwill is often described quantitatively as "the excess of cost over the fair value of the identifiable net assets acquired."  *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1039 (Fed. Cir. 2003); *see also Jack Daniel Distillery v. United States*, 379 F.2d 569, 579 (Ct. Cl. 1967).  This residual value approach properly signals the existence of goodwill, of course, only if both sides of a transaction are balanced; it does not work "when one party to the transaction achieves a bargain."  *R.M. Smith, Inc. v. Comm'r of Internal Revenue*, 591 F.2d 248, 252 (3d Cir. 1979), *cert. denied*, 444 U.S. 829 (1979); *see also Jack Daniel Distillery*, 379 F.2d at 579.

---

[20]  In *Newark Morning Ledger*, the Supreme Court allowed the taxpayer to take depreciation deductions for its subscriber base, finding that these "paid subscribers" "constituted a finite set of subscriptions" and were not "composed of constantly fluctuating components." 507 U.S. at 567.  The latter fact distinguished the subscriber base from so-called "mass assets," that is, non-amortizable "customer-based intangibles" that were considered "self-regenerating assets that may change but never waste."  507 U.S. at 558; *see also Capital Blue Cross v. Comm'r of Internal Revenue*, 431 F.3d 117, 126 (3d Cir. 2005).

Because of this, courts sometimes combine the qualitative and quantitative approaches, seeking to reinforce one with the other.

So, under these definitions, did KZLA possess goodwill at the time that it was transferred by plaintiff in exchange for the St. Louis Stations? There is no dispute that the enterprise value of KZLA in the swap transaction was $185 million. Likewise, the parties agree that, as of the date of the transaction, the value of KZLA's tangible assets was $3,384,637, and the value of its intangible assets (apart from the station's FCC license and any goodwill) was $4,858,317. But, what do we do with the residual – the $176,757,046 difference between the $185 million and the stipulated value of the other assets ($8,242,954)? More specifically, the question is whether any portion of that difference is attributable to KZLA's goodwill? Plaintiff claims the answer to that question is no – arguing that the station possessed no goodwill and that all the value associated with the residual should be attributed to the station's FCC license. Not so, defendant retorts, asserting that the value of the FCC license was much less than what plaintiff claims, and that what is left, when that reduced license value is subtracted from the residual, is the value of KZLA's goodwill. As to that amount, defendant argues, the exclusion under section 1031 is triggered, producing gain under section 1001(a) of the Code. Determining which of the parties is right  presents several questions of fact that can be resolved only by weighing all the evidence, a matter to which this court now turns.

**1.      Qualitative Indicia of Goodwill**

There are indications that KZLA may have possessed some degree of goodwill with respect to its audience and, relatedly, its advertisers. KZLA was the only Class B station with a country format in a market of nearly 13 million listeners. Listeners in portions of that market closely followed KZLA – a factor that Emmis considered in retaining KZLA's country format. Since the real customers of a radio station are its advertisers, it bears noting that KZLA's retention of a set of loyal listeners was reflected in the market share numbers that, in turn, led to advertising rates and ad placements. For KZLA, of course, those numbers reflected a mixed bag, with the station seemingly not performing to its potential, as reflected by its declining revenue share and power ratio during the relevant period. But, the record also hints at the notion that advertisers selling products that might be appealing to country listeners might have been more inclined to place ads with the dominant country station in the LA Market. Indeed, the evidence indicates that companies in the country music industry, as well as media buyers, viewed having a successful country station in Los Angeles – which at the time of the swap was the number one market for country record sales – as essential to the success of the format. Moreover, it is virtually undisputed that KZLA had a seasoned sales staff that had relationships with key advertising firms and that those relationships provided the station with a slight advantage over its competition.

In deciding that KZLA may have possessed some goodwill, the court is also mindful of the findings made by Coleman in its 1999 perceptual study of the station. In that study, Coleman found, *inter alia*, that KZLA listenership was "under-developed," and that the station lacked "brand depth" beyond music and an appropriate "image profile." The report indicated that the country format had the potential to support a top-five station in the important 25-54 age group,

further asserting that if KZLA realized its full potential it could grow a full share point above its then rating.  To aid KZLA in realizing these gains, Coleman made eleven separate recommendations, *e.g.*, that KZLA "will need aggressive external marketing to raise its top of mind awareness and strengthen its format and music position," as well as take a variety of other steps to improve its "music image marketing" and "music image position."  But, what exactly was the "brand depth" and "music image" that these extensive recommendations were designed to enhance – the enhancement of which would allegedly lead KZLA to realize its full potential as the dominant country station in the huge and burgeoning LA Market?  In the court's view, for tax purposes, it appears that this "brand depth" and "music image" are reflective of the existence of some degree of goodwill, albeit perhaps underdeveloped.  This depth and image appear to represent, to paraphrase Justice Story, an "advantage or benefit" beyond the value of KZLA's other assets "in consequence of the general public patronage and encouragement which [the station] receive[d] from constant or habitual customers."  Presumably, the steps recommended by Coleman were designed to enhance the station's base of constant or habitual customers, with the expectation that a resulting increased market share would translate readily into enhanced advertising revenue.

Both plaintiff, and BIA before it, flatly contend that a radio station can never possess goodwill because audience loyalty is a matter of format and on-air personalities.  That listeners might flee a station that suddenly changes its format or on-air personalities, however, does not prove plaintiff's point – any more than it would be true to say that other types of businesses cannot have goodwill because they would lose their customers if they fundamentally changed their business plans.  Can it be that nationally-recognized restaurant chains lack goodwill because their customers might flee if they radically changed their menus; or that sporting goods stores lack goodwill because they might decide to sell only flowers; or that familiar chains of coffee purveyors lack goodwill because they would lose their current business if they sold only soda?  One would think not.  For a host of strategic business reasons, an acquiring entity may defenestrate the critical and identifying features that, either individually or collectively, gave the acquired entity the expectation of continued patronage.  That it may choose to do so – perhaps hoping to gain still more patronage in a reformatted configuration – does not mean that the business it acquired lacked goodwill.  Put another way, whether goodwill exists as part of the assets acquired in a transaction cannot depend upon whether the buyer concludes that it is in its best interests to sustain the prior business model – that the prior goodwill must be accounted for if the prior business model is maintained, but not if that model is modified.

Nor does this court believe that KZLA necessarily lacked goodwill because it was underperforming.  There is undeniably a positive nexus between the existence of goodwill and the ability to generate profit – but that is to say neither that only profitable firms have goodwill, nor, especially, that only firms with profits above the norm possess that asset.  *See C.F. Hovey Co. v. Comm'r of Internal Revenue*, 4 B.T.A. 175, 177-78 (1926).  The proclivity of "'old customers . . . to resort to the old place,'" *Houston Chronicle Publ'g Co. v. United States*, 481 F.2d 1240, 1247 (5th Cir. 1993) (quoting *Comm'r of Internal Revenue v. Killian*, 314 F.2d 852, 855 (5th Cir. 1963)), may exist even where a firm is unprofitable, or at least not more profitable than the "norm."  Plaintiff's attempt to cabin goodwill to those stations earning above-average profits would leave the concept with no independent content, substantive meaning, or permanent

dimensions.  According to plaintiff, goodwill is a fleeting concept, here one instant and gone the next, depending upon a firm's current profit status – much like a Harry Potter wizard who disapparates in bad times and reappears in good.

In contending otherwise, plaintiff relies on several decisions of the Court of Claims.  For example, it asseverates that *Meredith Broadcasting* established a *per se* rule that FCC-licensed broadcasting stations can never possess goodwill.  In that case, the taxpayer acquired all the assets of a radio and a television station.  At issue was whether a portion of the purchase price attributed to intangible assets should be attributed to television network contracts.  The Court of Claims held that these contracts "were intangible assets of significant value" separate from all of the other intangible assets.  *Meredith Broad.*, 405 F.2d at 1224.  In so doing, it acknowledged that "considerable confusion" has arisen in this area because of "the shifting meaning of the term 'goodwill,'" which, in some instances was used to refer to the aggregate of all the intangibles of the business, and, in others, "in its narrow sense to refer to the traditional concept of goodwill as a matter of favorable customer relations." *Id.*  The court held that the network contracts were assets separate and distinct from the narrower concept of goodwill.  *Id.* at 1225-26.  It was within this context that the court commented, in regard to television stations:

> The station did not, however, have any particular goodwill in the sense of viewer preference or loyalty to the station.  This is because television audiences are attracted primarily by the programs and not by the particular broadcast station, call letters, station personnel or management.  Nor do television stations (including KPHO-TV in 1952) have any particular goodwill in the sense of advertiser preference for the station.  Television advertisers basically buy the attention of an audience on the best terms available or the lowest cost per thousand, and they place business with a station on the basis of the station's ability to reach an audience.

*Id.* at 1223.  Ultimately, the court concluded that the network contracts were not an expectancy or form of goodwill, but rather were separate, identifiable, and distinct assets.

A fair reading of *Meredith Broadcasting* does not support the proposition that a licensed radio station can never have goodwill.  Rather, the opinion appears to reflect nothing more than the court's view of the factual record as it related to the television broadcasting industry in the 1950s.  There is no reason for this court, after its own trial, to attribute those same factual findings to a radio station broadcasting a half a century later – in the era of the internet, social networking, and satellite broadcasting.  Nor is there any other basis for concluding that unlike other industries, radio stations universally lack any goodwill, at least as that concept is applicable herein.  *See also KFOX, Inc. v. United States*, 510 F.2d 1365, 1377 (Ct. Cl. 1975) (dealing with case in which goodwill had been identified as an asset transferred with a radio station); *Roy H. Park Broad., Inc. v. Comm'r of Internal Revenue*, 56 T.C. 784, 813 (1971) (indicating that a radio station can have goodwill, albeit "little").  Rejection of this *per se* rule is significant because BIA, the company that appraised KZLA's assets following the swap, viewed *Meredith* as establishing such a rule in concluding, in its valuation report, that "[i]t is well-established that broadcast stations do not possess any goodwill."  It was on the basis of this faulty premise that

- 16 -

BIA, after assigning values to KZLA's tangible and intangible assets, as well as its going concern value, used the residual basis for allocating the remainder of the purchase price to KZLA's FCC license ($176,757,046). Although the consequences of using this approach remain to be seen, the decisional law plainly suggests that approach was legally erroneous.

Plaintiff likewise claims that the Court of Claims adopted its view of the law in *Richard S. Miller & Sons, Inc. v. United States*, 537 F.2d 446, 451 (Ct. Cl. 1976). But, that is untrue. To be sure, in cataloguing various definitions of goodwill, the court there observed that one of them "equates goodwill with a rate of return on investment which is above normal returns in the industry and limits it to the residual intangible asset that generates earnings in excess of a normal return on all other tangible and intangible assets." *Id.* (citing Note, "Amortization of Intangibles: An Examination of the Tax Treatment of Purchased Goodwill," 81 Harv. L. Rev. 859, 861 (1967-68)).[21] It also observed that "[t]he term 'goodwill' has a varying content, depending on its usage." *Richard S. Miller & Sons*, 537 F.2d at 450. The Court of Claims, accordingly, neither suggested that its "excess return" definition was the controlling one for goodwill for Federal tax purposes, nor, more generally, that a firm, to have goodwill, must currently have above-average profits. Indeed, applying traditional notions of goodwill, the court found that a relatively poor-performing insurance business had goodwill, indicated by a variety of factors, including a "pattern of growth" and the fact that the acquirer negotiated a covenant not to compete from the seller. *Id.* at 453 (noting that the covenant not to compete was "the most significant indication that goodwill was transferred in the sale"). Notably, the court conducted no comparison between the insurance company's profits and the norm in the area – an omission that would make little sense if plaintiff was right about what that case holds.

Contrary to plaintiff's claims then, it would seem that questions involving the presence of goodwill in a given transaction must be resolved on the basis of the facts in a particular case, not some bright-line rule of law. To be sure, goodwill can be viewed as the "premium" that is paid over and above what other assets of the business would be worth if bought individually. *See R.M. Smith, Inc. v. Comm'r of Internal Revenue*, 69 T.C. 317, 320-22 (1977), *aff'd*, 591 F.2d 248 (3d Cir.), *cert. denied*, 444 U.S. 828 (1979); *Concord Control, Inc. v. Comm'r of Internal Revenue*, 78 T.C. 742, 745-47 (1982). But, logic and common sense suggests that such a premium might be realized even where the acquired entity is not currently profitable – perhaps based upon the expectation that it will become profitable. Yet, plaintiff assumed the contrary in ascribing the residual of the price paid for KZLA, less the value of identifiable tangible and intangible assets, entirely to the station's FCC license. It made no attempt to determine independently the value of that license so as to allow for the possibility that some premium

---

[21] Law & Economics scholars Judge Posner and Professor Landes have described the synergies related to sales and patronage, observing that "once the reputation [of a brand] is created, the [owner of the brand name] will obtain greater profits because repeat purchases and word-of-mouth references will generate higher sales and because consumers will be willing to pay higher prices for lower search costs and greater assurance of consistent quality." William M. Landes & Richard A. Posner, "Trademark Law: An Economic Perspective," 30 J.L. & Econ. 265, 270 (1987).

effectively was paid for KZLA beyond the value of its tangible and intangible assets, that is, for goodwill.

Plaintiff's reliance, moreover, on accounting conventions to support its *per se* rule is similarly misconceived. Accounting principles, which are designed to yield a conservative statement of current income, cannot be presumed to override the construct of the Internal Revenue Code. *See Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 542-43 (1979) (given their different objectives, "any presumptive equivalency between tax and financial accounting would be unacceptable"). Indeed, beginning in 2004, the Securities and Exchange Commission began requiring public radio stations to value directly their FCC licenses and assign the residual value to goodwill – a policy that caused companies, like Emmis, to identify and value the goodwill associated with their stations. *See* SEC Staff Announcement, "Use of Residual Method to Value Assets Other Than Goodwill" (Sept. 29, 2004) (citing Federal Accounting Board's Statement 141, paragraph 3).

So where does this leave us? In plaintiff's telling, the story here is black-and-white: KZLA possessed no goodwill based on bright-line legal distinctions applicable to all (or virtually all) broadcasting stations. The truth is more grey. There are a few indications that KZLA may have possessed some goodwill – albeit far less than some other radio stations, as various market metrics indicated. In the court's view, determining whether that goodwill was appreciable – or, alternatively, *de minimis* – requires an examination of the quantitative evidence that goodwill was transferred here. *See Jefferson-Pilot Corp. v. Comm'r of Internal Revenue,* 98 T.C. 435, 450 (1992), *aff'd*, 995 F.2d 530 (4th Cir. 1993). That, in turn, requires a determination as to whether there was some residual "cost over the fair value of the identifiable net assets acquired." *Coast Fed. Bank*, 323 F.3d at 1039; *see also Jack Daniel Distillery*, 379 F.2d at 579. On this valuation point, both parties rely heavily on expert opinions. Critically, the court is not bound to accept, *in toto,* those opinions, but may alter their findings based on its evaluation of the record. *See Jefferson-Pilot*, 98 T.C. at 450-51; *see also Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 688-89 (Ct. Cl. 1979). It is to that evaluation that the court now turns.

## 2. The Value of KZLA's Goodwill

Hewing to its view that KZLA lacked goodwill, plaintiff never offered a value for KZLA's goodwill. Defendant, for its part, employed its own version of a residual method – not to calculate the value of KZLA's FCC license, as BIA had done, but rather to assess the value of the station's goodwill.

To determine the value of the license, defendant's expert, Ms. Flynn, employed a direct valuation method – the income or discounted cash flow (DCF) method – a method that has been used by public radio stations, appraisers and, ultimately, the courts in valuing stations. *See Jefferson-Pilot*, 98 T.C. at 450-55. Under this method, Ms. Flynn attempted to isolate the income attributable to the FCC license by performing a discounted cash flow analysis of the station, treating it as a start-up. She prepared projections for the revenue, operating cash flow, and net free cash flow that KZLA could reasonably be expected to achieve in the market, giving consideration to past performance, market operating and financial benchmarks, as well as the

- 18 -

performance of other radio stations in the LA Market.  The operating cash flow was derived by subtracting from the revenue flow future operating expenses; the net cash flow was derived by subtracting from the operating cash flow taxes, depreciation, capital expenditures and additions to working capital.  Discounting the net free cash flow to present value, Ms. Flynn then isolated a value for KZLA's license.[22]  Using this method, Ms. Flynn initially set the value of KZLA's license, as of October 6, 2000, at $131.4 million, leaving a residual value of goodwill, as of October 6, 2000, of $45.4 million – a figure approximately $28 million below that employed by the IRS in asserting its deficiency against plaintiff.

Over time, Ms. Flynn further adjusted her calculations, each time reducing the value she ascribed to goodwill.[23]  At trial, plaintiff produced testimony from several experts questioning some of the remaining assumptions used by Ms. Flynn in her calculations.  In the face of this testimony, defendant has acknowledged some of the errors identified by plaintiff's witnesses.

This all obliges the court to examine further several of the critical steps employed by Ms. Flynn in her DCF calculations.  As presented at trial, those calculations incorporated the following steps/assumptions:

- **Market Revenue:**  Ms. Flynn used estimates by BIA that KZLA would generate $851 million in revenue in 2000, growing to $1.102 billion by

---

[22]  For a case in which a similar DCF method was employed, *see Jefferson-Pilot*, 98 T.C. at 452-53; *see also Meredith Broad.*, 405 F.2d at 1228-29.

[23]  The following chart shows how defendant's positions have varied regarding the relative values of KZLA's license and goodwill:

| Date | Procedural Posture | License Value | Goodwill Value |
|------|--------------------|---------------|----------------|
| 5/9/05 | IRS's Adjustment to Tax Return | $103,466,000 | $73,311,046 |
| 8/27/10 | Besen Expert Report | $161,957,046 – $152,707,046 | $14,800,000 - $24,050,000 |
| 8/29/11 | Flynn Expert Report | $131,366,000 | $45,391,000 |
| 3/9/12 | First post-trial submission | $140,247,000 | $36,510,000 |
| 7/20/12 | Post-trial brief | $156,957,046 | $19,800,000 |
| 7/28/13 | Second post-trial submission | $156,999,000 | $19,758,000 |

The Besen Expert Report was drafted by Dr. Stanley Besen, an expert for defendant who did not testify at trial; the report, however, was received in evidence.  Dr. Besen used a regression analysis in an attempt to calculate the value of KZLA's goodwill.  His conclusion that between 8 to 13 percent of the total value in the exchange was attributable to goodwill was attacked by plaintiff and largely abandoned by defendant.  In its post-trial briefs, defendant attempted to inject an entirely new argument into this case – that a significant portion of the value of the exchange related to going concern value.  But, the parties previously stipulated that the value of all intangibles, except for goodwill, was $4,858,317.  In the court's view, that stipulation, as well as defendant's failure to raise its going concern argument much earlier in the case, preclude it from relying on that argument at this late point.

2003 and $1.765 billion by 2009. In reaching this number, Ms. Flynn projected a gradual growth in the radio station's average audience share to 3.2 percent by the tenth year of the projection – slightly less than the average Class B FM station's audience share in 2000 (3.31 percent). She likewise projected that KZLA's power ratio would grow to 1.12 over time.

- **Expenses:** Ms. Flynn broke the projected station operating expenses into three categories: programming and engineering; advertising/promotion and sales; and other (which included general and administrative expenses). In projecting the growth of expenses, she relied upon historic KZLA operating data, as well as industry data. The figures she used correlated well with at least one comparison data set, relating to industry statistics.[24]

- **Capital Expenditures and Working Capital:** Ms. Flynn projected annual capital expenditures of $600,000 and a deduction for working capital equal to five percent of the change in revenues.

- **Taxes:** In computing her income flows, Ms. Flynn computed taxes at a 35 percent rate after deducting projected depreciation/amortization from operating cash flow. In calculating the amortization deductible with respect to the FCC license, Ms. Flynn assumed that the asset had a forty-year useful life and a value of $80 million.

- **Discount Rate:** Ms. Flynn discounted future cash flows by a factor of 11.7 percent that she derived by modifying figures available in Ibbotson's Valuation Edition Yearbook for 2001. To derive this discount figure, Ms. Flynn estimated the cost of equity financing (14.54 percent) and the after-tax cost of debt financing (7.48 percent). She then allocated those figures, presuming 60 percent of financings to be equity and 40 percent to be debt, yielding a weighted average cost of capital (WACC) of 11.7 percent.

- **Terminal Value:** Ms. Flynn arrived at her terminal values using the Gordon Growth formula, assuming a 4.5 percent perpetuity growth and a discount terminal value back ten years using the WACC of 11.7 percent.

- **Other Intangible and Tangible Assets:** In determining the residual value of goodwill, Ms. Flynn also deducted the value of the other tangible and intangible assets of KZLA that were exchanged. Those values came to approximately $8.243 million.

---

[24] That report was the National Association of Broadcasters' Radio Financial Report, published in 1992. Ms. Flynn's assumed expenses correlate, as a percentage of net revenue, to the data in this report.

As noted, before trial, Ms. Flynn initially set the value of KZLA's FCC license at $131.4 million, leaving $45,391,000 in goodwill.  At trial, however, she admitted that she had failed to include in her calculations all of KZLA's projected cash flow for 2009 and had incorrectly calculated working capital.  Correcting for these errors, her estimate of KZLA's license value increased, correspondingly dropping her estimate of the station's goodwill to $36,510,000.

At trial, plaintiff's experts cited alleged errors in Ms. Flynn's tax computations that she did not correct before trial.  They noted, for example, that she had failed to use the full value of KZLA's license in calculating the amortization deduction owed – instead, she used a proxy value of $80 million.  While Ms. Flynn claimed that she could not set the value of the license, for tax amortization purposes, in the same calculation she was using to establish the value of that license, in fact, the spreadsheet she employed appeared to permit that functionality – using that spreadsheet, one could repeat the calculations until the value used for amortization and the final value derived matched.  Apart from this, defendant admits that Ms. Flynn made two additional errors in her tax calculations:  (i) she used a 40-year, rather than the 15-year, statutory period prescribed by section 197 of the Code, as the useful life of the license, *see* Treas. Reg. § 1.197-2(f); and (ii) she started the amortization of the license as of January 1, 2001, rather than as of October 2000, as section 197 requires.  Plaintiff asserts that if one corrects for all three of these errors, *i.e.*, the value of the license, the useful life, and the starting date, the value of KZLA's "stick" license increases to $179,626,000, leaving no portion of the $185 million purchase price left to be allocated to goodwill.[25]  In the face of these claims, defendant, in its post-trial briefing, presented yet another revised value for the license that reflected two of the three modifications plaintiff proposed to the amortization deduction – that is, defendant still kept the proxy value of the license at $80 million, but adjusted the useful life and starting point for the amortization.  According to defendant, that brought the value of the FCC license up to $157 million, leaving a goodwill value of $19.8 million.

Logic suggests that the value of the license employed in determining the amortization deduction must closely approximate its actual value, lest the projected income stream from the license be understated, thereby causing the value of the FCC license to be understated.[26]  Simply picking a supposed "average" license value (*e.g.*, $80 million), as Ms. Flynn essentially did,

---

[25]  $185,000,000 less $179,626,000 leaves $5,374,000.  If one then deducts from that last figure the value of KZLA's other intangible and tangible assets ($8,243,000), the resulting figure is negative (-$2,869,000).

[26]  An understatement of the cash flow would occur if the amortization value of the license were too low because that would cause the amortization deductions associated with the license to be understated.  The latter understatement of deductions would, in turn, increase the amount of taxes accounted for in the projections, which would reduce the projected income stream and, when present-valued, the value of the FCC license.

makes no sense in a DCF calculation.[27]   In addition, the court agrees with plaintiff that Ms. Flynn's discount rate (the WICC) was too high.   That rate was calculated by separately deriving a cost of equity financing and an after-tax cost of debt financing, and then averaging those percentages in proportion to a market analysis reflecting how radio companies generally financed their capital (*e.g.*, how much equity versus debt financing the stations used).   Changing this discount factor impacts the value of the license derived:   The higher the rate employed, the lower the present value of the FCC license derived when the station's future income is discounted – and the higher the residual value of goodwill.   Conversely, the lower the discount rate derived via this calculation, the higher the present value of the FCC license obtained, and the lower the residual value of goodwill.   Because Ms. Flynn's discount rate was overstated, it caused her to derive values for the license that were too low, and ultimately caused her to set a value of goodwill that was too high.

With this in mind, the following are the specific errors that plaintiff demonstrated existed in Ms. Flynn's discount rate calculation:   First, she based her risk-free rate on the average yield of 20-year U.S. Treasury bonds in the year 2000 (6.8 percent), rather than focusing on the yield of those bonds in October 2000 (6.04 percent).   Consistent with the testimony of plaintiff's experts, the court believes that the 6.04 percent figure should be employed as the starting point for determining the cost of equity that would have been incurred by a start-up radio station looking to obtain equity financing in October 2000.   This approach is consistent, *inter alia*, with how Ms. Flynn approached the debt component of her discount rate, which began with the prime rate as of October 2000.   Second, while Ms. Flynn's cash flow projections were somewhat rosy as compared to KZLA's historical performance, indications are that the equity risk premium she used in calculating her cost of equity was too high.[28]   Several reliable economic sources cited by

---

[27]   Ms. Flynn derived her average by identifying what she argued were ten comparable radio sales from around the country between October 1995 and March 2000.   There are several major problems with this approach.   For one thing, Ms. Flynn failed to explain why the license values she used – which involved station sales in places like Philadelphia, San Francisco, Chicago, and New York City – were comparable to the value that should be assigned to a license in Los Angeles.   Since all but two of these transactions she used were between 1995 and 1997, it is obvious that they did not capture the explosion in license values that was occurring in the LA Market in 2000.   Even more disturbing is the fact that Ms. Flynn disregarded a number of sales (including four transactions in 2000) that occurred in the period immediately following the KZLA transaction – perhaps not coincidentally, use of these transactions would have produced a much higher proxy figure for the license.

[28]   The risk-free rate "is the rate of return an investor can obtain without taking market risk," often set at the rate of return on long-term Treasury securities.   Ibbotson Assocs., Stocks Bonds, Bills, & Inflation:   Valuation Edition 2003 Yearbook, at 253 (2003) (hereinafter "Ibbotson").   The equity risk premium is "the additional return an investor expects to compensate for the additional risk associated with investing in equities as opposed to investing in a riskless asset." *Id.* at 251; *see also Spectrum Sciences and Software, Inc. v. United States*, 98 Fed. Cl. 8, 26 n.27 (2011); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 764 (2004).

plaintiff establish that this premium should not have been 8.1 percent, but rather no more than 6 percent.[29]  Finally, defendant agrees that the calculation of her discount factor should have taken into account a greater projected use of debt (a 58 percent equity/42 percent debt ratio, rather than the 60/40 split used in her report), thereby lowering the final discount factor further.  The following chart tracks the required changes:

| WEIGHTED AVERAGE COST OF CAPITAL CALCULATION | | |
| --- | --- | --- |
| | Original | Adjusted |
| Risk-free rate | 6.80 % | 6.04 % |
| Equity risk premium | 8.10 % | 6.00 % |
| Size premium | 0.80 % | 0.80 % |
| Industry risk premium | -1.16 % | -1.16 % |
| Cost of equity | 14.54 % | 11.68 % |
| | | |
| Prime rate | 9.50 % | 9.50 % |
| Prime adjustment | 2.0  % | 2.0  % |
| Cost of debt | 11.50 % | 11.50 % |
| After-tax COD | 7.48  % | 7.48  % |
| | | |
| % Equity | 60 % | 58 % |
| % Debt | 40 % | 42 % |
| Total | 100 % | 100 % |
| | | |
| WACC | 11.71 % | 9.91 % |

As the chart indicates, making all three adjustments to Ms. Flynn's discount rate calculation reveals that her discount rate (the weighted average cost of capital or WACC) should have been 9.91 percent, rather than 11.71 percent.

While defendant's post-trial goodwill figure of $19.758 million reflects the 58 percent equity/42 percent debt ratio, it does not account for the other changes that must be made to correct Ms. Flynn's calculations.  Specifically, her post-trial figure must be adjusted further to reflect:  (i) a value of the license for amortization purposes that more closely corresponds to its actual value; and (ii) the new discount factor (9.91 percent), with an equity component that reflects a modified risk free rate of 6.04 rather than 6.8 percent and an equity risk premium of 6.0 rather than 8.1 percent.  The following chart illustrates the impact of these changes in alternating scenarios by:  (i) modifying (in column C) the amortization value of the FCC license, and (ii) showing (in column E) how the ultimate value of the license would be affected under four discount rate scenarios:  (a) where the equity rate is the same as in defendant's calculation;

[29]  Mr. Jerry Hausman, one of plaintiff's experts, convincingly testified that there are at least a half a dozen articles that would indicate that 8.1 percent is "too high."  He pointed to a paper by Professors Faumin and French, and to an opinion by Jeremy Siegel of the Wharton School at the University of Pennsylvania.

- 23 -

(b) where the equity rate is adjusted to modify the risk-free rate; (c) where the equity rate is adjusted to modify the equity risk premium; and (d) where the equity rate is adjusted to modify the risk-free rate and the equity risk premium.[30]   Here is that chart:

| (A) Transaction's Total Value | (B) Less Tangibles & Intangibles | (C) Amortization License Value | (D) Equity Rate: Changes to Defendant's Calculations | (E) License Value | (F) Goodwill Value (Remainder) |
|---|---|---|---|---|---|
| 185 | 8.243 | 80 | No Change | 156.999 | 19.758 |
| | | | Modified Risk Free Rate | 169.088 | 7.669 |
| | | | Modified Equity Risk Premium | 194.934 | -18.177 |
| | | | Both Modifications | 212.954 | -36.197 |
| 185 | 8.243 | 120 | No Change | 167.298 | 9.459 |
| | | | Modified Risk Free Rate | 180.031 | -3.274 |
| | | | Modified Equity Risk Premium | 207.241 | -30.484 |
| | | | Both Modifications | 226.202 | -49.445 |
| 185 | 8.243 | 156.742 | No Change | 176.757 | **0.000** |
| | | | Modified Risk Free Rate | 190.083 | -13.326 |
| | | | Modified Equity Risk Premium | 218.545 | -41.788 |
| | | | Both Modifications | 238.371 | -61.614 |
| 185 | 8.243 | 170 | No Change | 180.170 | -3.413 |
| | | | Modified Risk Free Rate | 193.710 | -16.953 |
| | | | Modified Equity Risk Premium | 222.624 | -45.867 |
| | | | Both Modifications | 242.762 | -66.005 |
| * Data in millions of dollars | | | | | |

Several key findings flow from this chart.  For one thing, it appears that KZLA's goodwill values (those listed in column F) fall below zero if the calculation is adjusted to reflect the two equity rate adjustments discussed above – even if the court continues to use defendant's extraordinarily low proxy value of $80 million for the license.  If, instead, the amortization value of the license is increased toward its actual value – as can be seen by comparing the values in column C with those in column E – it appears that, even using Ms. Flynn's original discount factor of 11.71 percent, the value of KZLA's residual goodwill falls below zero at an amortization value for the license of around $156,742,000.[31]   This is because even using this still understated value to

_____

[30]   The court generated these statistics by making simple modifications to the cells in the spreadsheet provided to the court by defendant.

[31]   Modifying defendant's spreadsheet reveals that, contrary to Ms. Flynn's claims, one may determine the point at which the amortization value of the FCC license and the calculated license value equate.  The following chart shows those points using various assumptions for the equity portion of the discount rate:

calculate the amortization deduction leads to a calculated license value in excess of $176.7 million – which leaves nothing for goodwill. In short, the chart demonstrates that if the court makes virtually any **one** of the changes that must be made to straighten out her calculations – let alone **all** the changes required – Ms. Flynn's discounted cash flow method yields a value for KZLA's goodwill that collapses to zero or below.

So what does this mean? Indisputably, the burden of proof here is on the plaintiff. *See United States v. Janis*, 428 U.S. 433, 440-41 (1976); *see also Charron v. United States*, 200 F.3d 785, 792 (Fed. Cir. 1999). Accordingly, to prevail, defendant need not prove that a positive value should be assigned to goodwill; rather, plaintiff must prove otherwise. But, that does not mean that the court must turn a blind eye to the results of defendant's shrinking attempts to value the goodwill supposedly present here in deciding whether plaintiff has met its burden of proof. *Per contra*. Having embraced the residual value method as the proper method of valuing goodwill here, defendant cannot avoid the results produced by that method when they turn negative. As other cases illustrate, the use of discount calculations to value goodwill represents a double-edged sword, in that the numbers can demonstrate either the presence or the absence of goodwill. *See Jack Daniel Distillery*, 379 F.2d at 579; *Phila. Steel & Iron Corp. v. Comm'r of Internal Revenue*, 344 F.2d 964 (3d Cir. 1965) (adopting the opinion of 23 T.C.M. (CCH) 558 (1964)); *R.M. Smith v. Comm'r of Internal Revenue*, 36 T.C.M. (CCH) 97, 112 (1977), *aff'd*, 591 F.2d 248 (5th Cir. 1979).[32] Here, those calculations thoroughly undercut defendant's position and, in so doing, substantially aid plaintiff. Put another way – by consistently demonstrating that

| Break Even (Amortization Value = License Value) | |
|---|---|
| Equity Rate:  Changes to Defendant's Calculations | License Value |
| No Change | 183.696 |
| Modified Risk Free Rate | 202.639 |
| Modified Equity Risk Premium | 246.010 |
| Both Modifications | 278.795 |
| * Data in millions of dollars | |
| ** Values "equal" when rounded to nearest 1,000 | |

This chart perhaps explains why Ms. Flynn could not use the actual license value for amortization purposes if she hoped to find a positive value for KZLA's goodwill. That is because the "break even" values for the license – the point at which the amortization and final values of the license are the same – all are too high to leave any value for goodwill.

[32] The record suggests that no value could be ascribed to goodwill if the court were to compute the value of that asset by capitalizing projected "excess" earnings, as no proof was adduced that such "excess" earnings could be projected. *See Banc One Corp. v. Comm'r of Internal Revenue*, 84 T.C. 476, 506 (1985), *aff'd*, 815 F.2d 175 (6th Cir. 1987) (discussing the relative merits of calculating goodwill via this formula method as opposed to the residual method (and favoring the latter)).

defendant's calculations yield values for goodwill that are below zero, plaintiff has shown that, under any set of reasonable assumptions, any goodwill present in this transaction was, at most, negligible.  That was true either because KZLA did not possess more than a negligible amount of goodwill or because Emmis did not, for purposes of section 1031, exchange anything of value for KZLA's goodwill when it transferred its radio station assets for those held by BHC and BIC.

The latter point bears a few additional words.  A preponderance of the evidence suggests that the parties to the KZLA exchange did not intend to attribute any part of the exchange value to the station's goodwill – that Emmis did not provide, and plaintiff did not receive, anything for that goodwill as a part of the transaction.  *See Beeler*, 73 T.C.M. at 1987. (for purposes of section 1031, transfer did not include business' goodwill or going concern value).  The buyer (Emmis) determined the amount it was willing to pay BHC and BIC on the basis of the realities of the marketplace and its apparent analysis of the value residing in the assets or operations of KZLA.  Under the circumstances of this case, KZLA's license was the heart and backbone of the station's value.  While the rest of its tangible and intangible assets offered some value to Emmis, it would appear that Emmis parted with no appreciable value for the station's goodwill.  This finding, again, is driven by the fact that no reasonable allocation of the exchange value – $185 million – leaves any room for assigning a transferred value to goodwill.  It is not simply a matter of giving effect to the parties' expressed subjective intentions.

In analogous circumstances, when use of the residual value method left nothing to be allocated to goodwill, the Tax Court has held that a taxpayer need not allocate a separate value to assets in the nature of goodwill.  *See, e.g.*, *Charles Schwab Corp. v. Comm'r of Internal Revenue*, 122 T.C. 191, 214-15 (2004), *supp. on other grounds*, 123 T.C. 306 (2004); *Monaghan v. Comm'r of Internal Revenue*, 40 T.C. 680, 686 (1963); *see also R.M. Smith*, 36 T.C.M. at 112; *see also Maseeh v. Comm'r of Internal Revenue*, 52 T.C. 18, 24 (1969).[33]  Such was also the holding in *Republic Steel Corp. v. United States*, 40 F. Supp. 1017 (Ct. Cl. 1941).  In *Republic*, the seller and buyer of patents agreed, in their price negotiations, that the value of the stock sale designed to effectuate the transfer of the patents reflected the value of the patents and certain other assets on the company's books; the record reflected that the acquirer had no intention of purchasing a continuing business and thus "placed no value on [goodwill] in determining whether or not to pay the price demanded." *Id.* at 1023.  In such an instance, the Court of Claims held that no part of the cost of the stock was allocable to goodwill.  In so concluding, this court's

---

[33]  The fact that the exchange was a genuine multiple-party transaction involving an unrelated entity (Emmis) adds some credence to this position.  As the Supreme Court put it in a related context –

> where . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

*Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978).

predecessor stated:  "[i]t may be that the seller's good will really did have a value, but if the parties did not think so and, in computing the price to be paid, gave it no value, it must be eliminated from consideration in computing the amount paid for the other assets."  *Id.*; *see also Meister v. Comm'r of Internal Revenue*, 302 F.2d 54, 57 (2d Cir. 1962).[34]

Now, of course, there is another possibility – that other errors in Ms. Flynn's calculations overstated the value of KZLA's license and, concomitantly, understated the value of KZLA's goodwill.  But, neither party has identified those errors with any specificity and the court will not wade into this thicket on its own.  That is particularly so because the notion that the value of the KZLA's FCC license was so great as to suggest that no goodwill was accounted for in the exchange is confirmed by the sale of a radio station that occurred less than a month after the KZLA transaction.  Specifically, at trial, plaintiff showed that on November 3, 2000, radio station KFSG was sold at auction for $250 million.  KFSG was similar to KZLA in several critical ways – it was, for example, a Los Angeles-based Class B station.[35]  Yet, KFSG did not have as good a signal as KZLA – unlike the latter station, KFSG did not have a transmitter located on Mt. Wilson.  KFSG was acquired in a "stick" transaction – where only the license, tower/antenna and transmitter were acquired – by a broadcaster that intended to and, indeed, did drop the religious format of the station and replace it with Spanish programming.  And, yet, that broadcaster paid nearly $65 million more than the amount of the value exchanged in the KZLA

---

[34]  In *Jefferson-Pilot*, the Tax Court employed a similar rationale in rejecting the Commissioner's argument that an FCC license had no value separate and apart from goodwill. In this regard, it reasoned:

> Respondent's argument that an FCC license has no value separate and apart from goodwill does not withstand logical analysis.  For example, a hypothetical purchaser of a station who wanted to change the format and hire a new staff would probably pay little, if anything, for goodwill.  This is because the change in format would attract new listeners, and the old listeners would find a new station whose format was similar to the one they listened to before the purchase. Similarly, many of the station's sponsors would advertise on other stations whose formats target their consumers.  Goodwill would be of little value to this purchaser.  The same would be true of a station that had not generated any profits in previous years.  A prospective purchaser would probably pay very little for the goodwill associated with such a station.  In arriving at a purchase price, this purchaser would probably determine the value of the station's tangible assets and then place a value on the right to enter into the business of broadcasting.

98 T.C. at 455-56; *see also Meredith Broad.*, 405 F.2d at 1228.

[35]  "A 'comparable' must be substantially similar to the entity or asset that is at issue." *Caraci v. Comm'r of Internal Revenue*, 456 F.3d 444, 459 (5th Cir. 2006); *see also Van Zelst v. Comm'r of Internal Revenue*, 100 F.3d 1259, 1263 (7th Cir. 1996); *Estate of Palmer v. Comm'r of Internal Revenue*, 839 F.2d 420, 423 (8th Cir. 1988).

transaction, with every indication that all but a small portion of that $250 million was for one thing, and one thing alone – KFSG's FCC license.  In the court's view, this transaction confirms that the values generated by Ms. Flynn's adjusted calculations – numbers that suggest that the value of KZLA's license left no room for allocating any value to goodwill – were correct and represent the high value that the LA Market placed on the FCC licenses of radio stations with strong signals.  *See R.M. Smith*, 591 F.2d at 253 (residual value method is appropriate where supported "by other collateral evidence").

*        *        *        *        *

To recapitulate, the "[e]xistence of 'good will' and the value thereof are primarily questions of fact which 'must necessarily be considered in the light of [the] facts in each case.'" *Miller v. Comm'r of Internal Revenue*, 333 F.2d 400, 404 (8th Cir. 1964); *see also Houston Chronicle*, 481 F.2d at 1245; *Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc.*, 333 F. Supp. 187, 196 (D. Neb. 1971); *Concord Control, Inc. v. Comm'r of Internal Revenue*, 78 T.C. 742, 744 (1982); *Drybrough v. Comm'r of Internal Revenue*, 45 T.C. 424, 435 (1966).  Based on the record as a whole, the court finds that if KZLA possessed any goodwill, its value was negligible and insignificant.  The court also finds that Emmis did not transfer any assets in exchange for that goodwill, such as it was.  While the record, as a whole, tends to support these findings, the adjusted calculations summarized above prove the sockdolager on this count.  Plaintiff thus prevails on this first issue.

## B.    Classification of Station Assets for Depreciation Purposes

The court now turns to the dispute concerning the proper class lives that should have been assigned to certain assets placed into service by plaintiff between 1988 and 2000.  Section 167(a) of the Code provides "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear . . . . of property used in the trade or business."  26 U.S.C. § 167(a).  For the property in question, section 168 of the Code sets forth rules for determining the amount of the depreciation allowed under section 167(a).  In pertinent part, section 168(c) provides the time period over which an asset is depreciated, a function accomplished by placing assets into particular classes of property.  The class lives of depreciable assets can be found in a series of revenue procedures issued by the IRS.  *See* Treas. Reg. §§ 1.167(a)-11(b)(4)(ii); *see also* § 1.168-3, Proposed Income Tax Regs., 49 Fed. Reg. 5957 (Feb. 16, 1984).  The revenue procedure in effect for the years in question was Rev. Proc. 87-56, 1987-2 C.B. 674.  *See Iowa 80 Grp., Inc. v. Internal Revenue Serv.*, 406 F.3d 950, 952 (8th Cir. 2005); *Saginaw Bay Pipeline Co. v. United States*, 338 F.3d 600, 605 (6th Cir. 2003).  For nonresidential real property, Rev. Proc. 87-56 generally sets a recovery period of 31.5 years.  For non-real (personal) property, Rev. Proc. 87-56 includes a lengthy table that breaks down that property into asset classes and assigns recovery periods or class lives to those classes.  Rev. Proc. 87-56, § 5.03.  As noted by the Tax Court in a recent case, the table breaks "assets into two broad categories:  (1) asset guideline classes 00.11 through 00.4, consisting of specific depreciable assets used in all business activities (the asset category), and (2) asset guideline classes 01.1 through 80.0, consisting of depreciable assets used in specific business activities (the activity category)."  *Broz*

- 28 -

*v. Comm'r of Internal Revenue*, 137 T.C. 25, 31 (2011); *see also Norwest Corp. & Subs. v. Comm'r of Internal Revenue*, 111 T.C. 105, 158 (1988).

In 2002, BIC retained Deloitte to determine whether it was properly depreciating its assets.  As part of this process, Deloitte reviewed the electronic records associated with approximately 18,600 fixed assets.  With a few exceptions, Deloitte did not review the individual assets or discuss them with BIC employees, but merely reviewed the catalog of information assembled by BIC.  As part of this review, Deloitte determined that BIC was using an impermissible depreciation method with respect to 158 assets.  Deloitte assisted BIC in preparing and submitting an IRS Form 3115 (Application for Change in Accounting Method), requesting a change in the method by which BIC depreciated those assets.  The Commissioner allowed, in part, and disallowed, in part, the requested changes.

The disputed assets were originally classified by BIC as nonresidential real property with either a 39-year or 31.5-year life, depending upon when the asset was placed in service.  Deloitte determined that these assets should be reclassified as various forms of personal property.  The following table (drawn from one of plaintiff's briefs) summarizes plaintiff's claims with respect to these disputed assets:

| Asset Number | New Class | Nature of the Asset | Location of Asset |
|---|---|---|---|
| 21934 | 0.11 | Tenant improvements (X-ray machine equipment) | Salt Lake City |
| 21935 | 0.11 | Tenant improvements (X-ray machine equipment) | Salt Lake City |
| 21936 | 0.11 | Tenant improvements (X-ray machine equipment) | Salt Lake City |
| 22384 | 0.11 | Tenant Improvements (partition for sublease space, fire alarm, light switches, ductwork) | Chicago |
| 20456 | 0.11 | Tenant improvements (lights, design, *etc.*) | Salt Lake City |
| 16284 | 0.11 | Tenant improvements (partitions, carpentry, painting, wallpaper, doors, hardware and carpet) | Washington, DC |
| 16285 | 0.11 | Tenant improvements (partitions, doors, carpentry, painting, wallpaper, hardware and carpet) | Washington, DC |
| 19438 | 0.11 | Tenant improvements (partitions, doors, carpentry, painting, wallpaper, hardware and carpet) | Washington, DC |
| 9555 | 0.11 | Tenant improvements (glazing) | Salt Lake City |
| 9560 | 0.11 | Tenant improvements (millwork) | Salt Lake City |
|  |  |  |  |
| 22152 | 48.2 | Tenant improvements (air conditioning unit) | Chicago |
| 21073 | 48.2 | Tenant improvements (thermofuser and controls) | San Francisco |
| 21074 | 48.2 | Tenant improvements (thermostat ) | San Francisco |
| 7323 | 48.2 | Tenant improvements (10-ton a/c unit to cool transmitter and associated support equipment) | Chicago |
| 7324 | 48.2 | Tenant improvements (duct work, internal air blower and motor and filters to cool transmitter and associated support equipment) | Chicago |
| 7501 | 48.2 | Tenant improvements (7-ton a/c unit to cool transmitter and associated support equipment) | Chicago |
| 7502 | 48.2 | Tenant improvements (custom air handling system to cool transmitter and associated support equipment) | Chicago |
| 2792 | 48.2 | Tenant improvements (cable wire and electrical work for newsroom) | Salt Lake City |
| 2793 | 48.2 | Tenant improvements (cable wire and electrical work for newsroom) | Salt Lake City |
| 2252 | 48.2 | Tenant improvements (refrigerated air dryer) | Salt Lake City |

| 1927 | 48.2 | Tenant improvements (XMTR kitchen vent exhaust) | Salt Lake City |
| 1981 | 48.2 | Tenant improvements (construction of videotaping room) | Salt Lake City |
| 1982 | 48.2 | Tenant improvements (installation of ceiling over taping room) | Salt Lake City |
| 1983 | 48.2 | Tenant improvements (electrical work in dubbing room) | Salt Lake City |
| 1984 | 48.2 | Tenant improvements (electrical work – installation of dimmer in duplication room) | Salt Lake City |
| 1986 | 48.2 | Tenant improvements (installation of duct in dubbing room) | Salt Lake City |
| 16286 | 48.2 | Tenant improvements (partitions, doors, carpentry, painting, wallpaper, doors, hardware and carpet) | Washington, DC |
| 18866 | 48.2 | Tenant improvements (studio design and construction, wood shelving and custom wood cabinets) | Washington, DC |
| | | | |
| 1047 | 48.2 | Special purpose structure (house equipment at transmitter site) | Salt Lake City |
| 11063 | 48.2 | Special purpose structure (house equipment at transformer site) | Washington, DC |
| 18867 | 48.2 | Special purpose structure (house equipment at transmitter site) | Washington, DC |
| 23338 | 48.2 | Special purpose structure | St. Louis |

Based on plaintiff's claims, these assets largely fall into three broad categories:  (i) tenant improvements, such as x-ray machine (security) equipment, carpentry, glazing, millwork, painting, wallpaper, doors, hardware, and carpet; (ii) tenant improvements such as air conditioning units and associated duct work, and equipment to cool transmitters and associated support equipment, cable wire, and electrical work for broadcasting newsrooms; and (iii) special purpose structures located at transmitter sites used to house specialized equipment relating to such transmitters.  Plaintiff claims that the assets in the first of these categories should be properly classified within asset type 0.11 – office furniture, fixtures, and equipment, and the latter two categories as within asset activity class 48.2 – radio and television broadcastings.  *See* Rev. Proc. 87-56.  The court will discuss each of the categories *seriatim*.

### 1.      Tenant Improvements – Class 0.11

This first category contains ten assets that plaintiff believes should be in the revenue procedure's Class 0.11 Office Furniture, Fixtures, and Equipment category, which class has a ten-year class life and seven-year depreciation period.[36]  This class "includes furniture and fixtures that are not a structural component of a building," such as "desks, files, safes, and communications equipment."  Rev. Proc. 87-56, § 5.03.  This class "[d]oes not include communications equipment that is included in other classes."  *Id.*

As is true of many of the assets in question, plaintiff's factual assertions regarding the nature of the assets suffer from a relative dearth of supporting evidence, owing to a variety of reasons.  Take, for example, plaintiff's claims regarding assets 21934, 21935, and 21936, which inexplicably relate to a single invoice that was split into three "assets."  Plaintiff claims that this asset is an x-ray machine used for security at building entrances.  But, that is not clear from the invoice in question, which does not refer to such a machine, but rather to "LABOR, EQUIPMENT, & MATERIALS FOR RADIOTOGRAPHY (X-RAYING) AND

---

[36]  Asset Nos. 21934, 21935, 21936, 22384, 20456, 16284, 16285, 19438, 9555, and 9560.

ELECTRICAL." Nor is it supported by BIC's records, which refer to this "asset" as "Building Xrays for Handrails." It appears that the invoice was not for an asset, but for a service, and thus does not support plaintiff's attempt to reclassify these three "assets" as office furniture, fixtures, and equipment.

As it turns out, more evidence exists with respect to these "assets" than as to many of the other assets at issue, for which the only document provided is the internal BIC form recording information about the asset and perhaps a receipt. In other instances, some evidence is provided, but it is impossible to tell the exact nature of what was procured – for example, attached to the BIC form for Assets 20456, 9555, and 9560 is a master schedule of hundreds of Deloitte adjustment that does not identify the particular asset(s) in question, which purportedly relate, in the case of Asset 20456, to the remodeling of an office, and in the case of Assets 9555 and 9560, to glazing and millwork, respectively. No other information – no invoice, work order, purchase order, pictures, descriptions, *etc.* – is provided to define these assets, leading the court to conclude that the evidence presented is insufficient to support plaintiff's claim. Other evidence in the record indicates that the remaining assets in this category were plainly structural components of a building, among them, Asset 22384 (which was a demising wall to subdivide existing space), as well as Assets 16284, 16285, and 19438 (which relate to leasehold improvements, such as partitions, carpentry, ceilings, electrical, millwork, and painting).[37] Many of these items, in fact, are specifically listed as structural components of a building in Treas. Reg. § 1.48-1(e)(2), and thus are subject to the recovery period for nonresidential real property. *See also Amerisouth XXXII, Ltd. v. Comm'r of Internal Revenue*, 103 T.C.M. (CCH) 1324, 1330 (2012); Rev. Proc. 87-56, § 5.

In seeking to reclassify many of these assets, plaintiff seems to proceed from the notion that all it needed to do, to prevail, was to introduce Mr. Seabrook's opinions that a given asset was eligible, occasionally with a bit of supporting testimony by Mr. Florence. However, many of the facts upon which Mr. Seabrook relied do not otherwise appear in the record. In this regard, Federal Rules of Evidence 703 and 705 indicate that the facts underlying an expert's opinion do not come into the record as substantive evidence, but rather are admitted only for the limited purpose of enabling the trier of fact to scrutinize the expert's reasoning. *See 5860 Chi. Ridge, LLC v. United States*, 104 Fed. Cl. 740, 766 n.42 (2012); *see also United States v. Wright*, 783 F.2d 1091, 1100 (D.C. Cir. 1986); *United States v. Affleck*, 776 F.2d 1451, 1457 (10th Cir. 1985); 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6273 (1997). The fact that the documentation may have once existed, but was subsequently lost or destroyed, does not relieve plaintiff of its burden of demonstrating that the Commissioner's determinations were erroneous. *See Boddie-Noell Enters. v. United States*, 36 Fed. Cl.722, 741 (1996) (noting that "summary appraisals based on non-contemporaneous records, or data

---

[37]  A portion of these "assets" relate to carpeting, which is eligible for classification as office furniture and equipment. However, there is no way to trace between a quote attached to these assets and the asset values themselves (the total figures do not match), preventing the court from knowing whether, and to what extent, the assets plaintiff seeks to reclassify actually include an amount for carpeting.

reconstructed from accidentally lost or destroyed documents, are unpersuasive"); *Jupiter Corp. v. United States*, 2 Cl. Ct. 58, 71 (1983) (rejecting similar summaries prepared by an accounting firm).

Accordingly, the court denies plaintiff's claim as to all ten of the "assets" listed in this category.

### 2. Tenant Improvements Allegedly Used to Protect, Maintain, or House Broadcasting Equipment – Class 48.2

This second category contains eighteen assets, including ventilation systems, air conditioning units and air handling systems, and related ductwork, filters, internal air blowers, motors, electrical work, construction, ceiling installation, and building upgrades that plaintiff contends were installed or completed specifically to protect broadcasting equipment.[38]  Plaintiff claims that these assets fall within Class 48.2, Radio and Television Broadcastings, which has a six-year class life and a five-year depreciation period.  This class "includes assets used in radio and television broadcasting, except transmitting towers."  Rev. Proc. 87-56, § 5.

Plaintiff contends that this equipment and construction are needed to meet the temperature, humidity, and other environmental requirements necessary for the proper functioning of the broadcast equipment.  Defendant admits that five of these items (Nos. 22152, 7323, 7324, 7501 and 7502) fit this description.  It contends that the remaining thirteen assets constitute structural components of the building.

Section 5.05 of Rev. Proc. 87-56 provides that a building can be included in an asset class if it is so closely related to the use of the property it houses that it can be expected to be replaced when the housed property is replaced.  In setting forth this rule, the revenue procedure cites the regulations involving the investment tax credit provided in sections 38 and 48 of the Code.[39]  Specifically, it cites Treas. Reg. § 1.48-1, subparagraph (e)(1) of which states, in pertinent part, that:

> The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. . . .  Such term does not include (i) a structure which is

---

[38]  Asset Nos. 22152, 21073, 21074, 7323, 7324, 7501, 7502, 2792, 2793, 2252, 1927, 1981, 1982, 1983, 1984, 1986, 16286, and 18886.

[39]  During various periods over the last 30 years, section 38 of the Code authorized an investment tax credit for so-called "section 38 property."  Section 48(a) of the Code defines "section 38 property" to include "tangible personal property" and "other tangible property," such as industrial machinery, but to exclude "a building and its structural components."  26 U.S.C. § 48(a)(5)(D)(i).

> essentially an item of machinery or equipment, or (ii) a structure which houses
> property used as an integral part of an activity specified in section 48(a)(1)(B)(i)
> if the use of the structure is so closely related to the use of such property that the
> structure clearly can be expected to be replaced when the property it initially
> houses is replaced.  Factors which indicate that a structure is closely related to the
> use of the property it houses include the fact that the structure is specially
> designed to provide for the stress and other demands of such property and the fact
> that the structure could not be economically used for other purposes.  Thus, the
> term "building" does not include such structures as oil and gas storage tanks,
> grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen
> furnaces, coke ovens, brick kilns, and coal tipples.

Treas. Reg. § 1.48-1(e)(1).  Under this regulation, a structure generally is not a building if:  (i) it was specially designed to meet the demands of the equipment it houses; and (ii) it could not be economically used for other purposes.  *See L & B Corp. v. Comm'r of Internal Revenue*, 862 F.2d 667, 674 (8th Cir. 1988), *cert. denied*, 491 U.S. 905 (1989); *Consol. Freightways, Inc. v. Comm'r of Internal Revenue*, 708 F.2d 1385, 1389 (9th Cir. 1983).

Treas. Reg. § 1.48-1(e)(1) treats the structural components of a building the same as the building itself.  Treas. Reg. § 1.48(e)(2) defines such "structural components" to include –

> such parts of a building as walls, partitions, floors, and ceilings, as well as any
> permanent coverings therefor such as paneling or tiling; windows and doors; all
> components (whether in, on, or adjacent to the building) of a central air
> conditioning or heating system, including motors, compressors, pipes and ducts;
> plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and
> lighting fixtures; chimneys; stairs, escalators, and elevators, including all
> components thereof; sprinkler systems; fire escapes; and other components
> relating to the operation or maintenance of a building.  However, the term
> "structural components" does not include machinery the sole justification for the
> installation of which is the fact that such machinery is required to meet
> temperature or humidity requirements which are essential for the operation of
> other machinery or the processing of materials or foodstuffs.

*See also Hosp. Corp. of Am. v. Comm'r of Internal Revenue*, 109 T.C. 21, 54 (1997).  Under this definition, an item can be a structural component of a building even if it is not permanent, as long as it functions as an integral part of the building.  *Consol. Freightways*, 708 F.2d at 1390; *Publix Supermarkets, Inc. v. United States*, 26 Cl. Ct. 161, 175 (1992).  Air conditioning equipment comes within the exception in Treas. Reg. § 1.48-1(e)(1), and is not treated as a structural component of a building under Treas. Reg. § 1.48-1(e)(2), if the primary motivation for installing the equipment is to allow other equipment to function, with only incidental benefit to employees and customers.  *See Publix Supermarkets*, 26 Cl. Ct. at 175, 177; *see also Albertson's Inc. v. Comm'r of Internal Revenue*, 38 F.3d 1046, 1057 n.25 (9th Cir. 1993), *vacated in part, on other grounds*, 42 F.3d 537 (9th Cir. 1994); *see generally*, Fed. Tax Coordinator,

"Heating Equipment, Cooling Equipment, Air Conditions and Other Air Handling Equipment," L-17246 (2d ed. 2013).

Apart from the five assets specifically mentioned above, plaintiff's case as to this category is weak and overly relies upon uncorroborated factual assertions made by its expert witness.  For example, Assets 21073, 21074, 2252, and 1986 relate to air conditioning equipment and duct work installed in several of plaintiff's radio studios, a duplication room, and a dubbing room.  But the scant documentation attached to the BIC forms does not reveal the purpose of this equipment and, in particular, does not support plaintiff's claim that this equipment was used to meet temperature or humidity requirements for the operation of machinery in those studios (with only incidental benefit to the occupants).  The documentation for other assets in this category (Assets 1981, 1982, 1983, and 1984) reveals that they constituted structural components of the building (*e.g.*, the walls of a video taping room, the ceiling of a duplication room, electrical work) and thus were properly characterized by the Commissioner.  The same can be said of Asset 16286, which, like some of the assets in the prior category, relates to leasehold improvements, such as partitions, carpentry, ceilings, electrical, millwork, and painting.  The next two assets in this category (Assets 1927 and 18866) defy accurate description/ characterization because they again are based upon broad descriptions of groups of items – the former based on the master schedule of Deloitte's adjustment discussed above, the latter on a generic description of improvements (*e.g.*, "miscellaneous leasehold improvements including studio design and construction") – with little or no explanation as to how what is on the schedule relates to the asset description.[40]  Likewise, plaintiff's claims with respect to other assets in this category, such as Assets 2792 and 2793, are based solely on the cryptic BIC forms, with no supporting documentation whatsoever.  And, again, for the reasons stated above, the court does not believe that these sketchy forms meet plaintiff's burden in seeking to set aside the Commissioner's determinations.

Based on defendant's concession, the court allows for the reclassification of Asset Nos. 22152, 7323, 7324, 7501, and 7502, but denies plaintiff's claims as to the remainder of the assets in this category based on a failure of proof.

---

[40]  In its post-trial briefs, plaintiff repeatedly repines that it has failed to provide explanations as to how evidence like this supports its claims because of "space limitations."  The court, however, afforded each party 160 pages for post-trial briefing – well in excess of what is normally provided and exactly what was requested.  Accordingly, the notion that plaintiff could not squeeze into its briefs explanations of how the record supports its specific depreciation claims has a decidedly hollow ring – particularly, as the record does not hold much evidence for plaintiff to summarize.

3.    **Structures Designed and Built to House and Protect Specialized Broadcasting Equipment – Class 48.2**

This final category contains four assets allegedly designed and built to house and protect broadcast equipment.[41]  Defendant takes the position that these structures are buildings. Plaintiff, however, maintains that under Treas. Reg. § 1.48-1(e)(1), they are what are known as "special purpose structures" and, therefore, exempted from the definition of "building."

As noted above, under the regulations, among the factors which indicate that a structure is a special purpose structure are "the fact that the structure is specifically designed to provide for the . . . demands of [the] property [which it houses] and the fact that the structure could not be economically used for other purposes." Treas. Reg. § 1.48-1(e)(1)(ii); *see Bundy v. United States*, 1986 WL 13364, at *5 (D. Neb. Nov. 19, 1986).  In applying the regulation, courts typically have focused less on appearances, *e.g.*, whether a structure has walls and a roof, and more on the function of the structure, *e.g.*, does it provide shelter, or furnish working spaces.  *See King Radio Corp., Inc. v. United States*, 486 F.2d 1091, 1096 (10th Cir. 1973); *Consol. Freightways*, 708 F.2d at 1388; *Hart. v. Comm'r of Internal Revenue*, 78 T.C.M. (CCH) 114, 117-19 (1999); *cf. Minot Fed. Sav. & Loan Ass'n v. United States*, 435 F.2d 1368, 1370-71 (8th Cir. 1970).[42]  In applying that functional test, courts have split on the impact of having human activity occur within the structure, with some finding the quantum of such activity important, *see, e.g.*, *Consol. Freightways*, 620 F.2d at 873; *Munford, Inc. v. Comm'r of Internal Revenue*, 87 T.C. 463, 481-83 (1986), *aff'd*, 849 F.2d 1398 (11th Cir. 1988); and others more inclined to find that a structure is a building even if it only "provides shelter for significant machine or animal activity," *L & B Corp.*, 862 F.2d at 672; *see also, e.g.*, *Boddie-Noell Enters.*, 36 Fed. Cl. at 739-40.  That said, most courts appear to agree that a structure is not a building if the structure itself performs an activity.  *See Brown-Forman Distillers Corp. v. United States*, 499 F.2d 1263, 1272 (Ct. Cl. 1974) (whiskey maturation facilities); *Brown & Williamson Tobacco Corp. v. United States*, 369 F. Supp. 1283, 1287 (W.D. Ky. 1973) (tobacco drying sheds); *Cent. Citrus Co. v. Comm'r of Internal Revenue*, 58 T.C. 365, 371 (1972) (atmospherically-controlled "sweet rooms" to ripen fruit).

In the midst of this split, it would appear that the former Court of Claims was decidedly amongst those courts that focus more heavily on whether a structure provided working space for employees.  Thus, in *Brown-Forman*, the Court of Claims, in holding that whiskey maturation facilities were not "buildings," held that the fact that a structure has features in common with a "building" is not determinative, finding instead that "a major inquiry [is] whether the structures provide working space for employees that that is more than merely incidental to the principal function or use of the structure." 499 F.2d at 1271.  Later, in *Consolidated Freightways*, that court refined this standard, noting that "in deciding whether the human activity is merely

---

[41]   Asset Nos. 1047, 11063, 18867, and 23338.

[42]   *Compare Consol. Freightways, Inc. v. United States*, 620 F.2d 862, 870 (Ct. Cl. 1980) ("Of course, if a structure does not appear to be a 'building,' it is not a 'building.'").

incidental to the function or use of the structure or whether that structure functions to provide working space for employees, more than merely the amount of such activity must be considered." 620 F.2d at 871. After examining the case law, the court then concluded that –

> in determining whether the structure provides working space for employees which is more than merely incidental to the principal function or use of the structure, we must examine the frequency of the human activity inside the structure, how essential such activity is to the basic process or use involved and how substantial that activity is. . . . The human activity must be considered both qualitatively and quantitatively to properly characterize its relationship to the principal function or use of the structure involved.

*Id.* at 872-73. Employing this analysis, the court distinguished the loading docks that were the subject of its case from the whiskey maturation facilities in *Brown-Forman*, finding that the movement of freight that occurred on the former structure was fundamentally different from the chemical activity that occurred in the latter. *Id.* at 873. As to the loading docks, the court thus found that "[t]he essential human activity within the structures consists of the manual labor expended in moving the freight, temporarily staging the freight and checking for overages, shortages and damaged freight," adding that "[n]othing about the structure allowed for this basic function to occur without this essential human activity." *Id.* And, on this basis, the court found that the loading docks were a building and not subject to any of the exceptions in the regulations. *Id.* at 874; *see also Consol. Freightways*, 708 F.2d at 1388-89.

The scant evidence provided by plaintiff as to the four buildings in question (Assets 1047, 11063, 18867, and 23338) largely takes the form of excerpts from the Deloitte report – excerpts that, at least in some instances, readily admit that further documentation about the nature of these assets is unavailable. This evidence does not demonstrate that these buildings were built to house particular assets or that they could not serve other purposes if the equipment therein was removed. In three instances (Assets 1047, 11063, and 23338), plaintiff has provided no photos, plans or detailed descriptions of these buildings – and there was little testimony from the witnesses who had seen these buildings. Plaintiff provided more detail as to Asset 18867 – but that detail, indeed, revealed that this building contained not only transmitter facilities, but also restrooms, offices, storage rooms, and an apartment. This information hardly served to bolster plaintiff's claim that this building – which was built in 1939 – was a "special purpose" structure designed to house a modern transmitter. Plaintiff's documentation did include some very general information regarding the nature of human activity occurring in these buildings, most often described as maintenance work (*e.g.*, a listing of the individuals who worked in the respective buildings, and an estimate of how many hours per month were spent working at the structure). But, this information, which took the form of unsworn answers to a set of Deloitte survey questions, is not detailed enough – let alone reliable enough – to allow the court to make the sort of fine distinctions that were made in *Consolidated Freightways*. That said, the raw number of hours reflected in these estimates – for one asset, 16-32 hours per month of maintenance and 128-144 hours per month of office time within the structure – readily serve to

distinguish this case from those in which a special purpose structure was not deemed a building.[43]

In sum, in the court's view, plaintiff's evidence as to these four assets falls far short of what is necessary to overcome the Commissioner's determinations.

\*          \*          \*          \*          \*

Accordingly, based on defendant's concession, the court allows for the reclassification of Asset Nos. 22152, 7323, 7324, 7501, and 7502, but denies plaintiff's claims as to the remainder of the assets in question owing to a significant failure of proof.

## III.   CONCLUSION

The court need go no further.  As to the exchange of KZLA, the court concludes plaintiff has established that KZLA did not possess any significant goodwill that was accounted for in that transaction.  Rather, it would appear that KZLA's value was exclusively in its FCC license, as well as a few associated tangible and intangible assets.  Regarding the reclassification issue, the court upholds plaintiff's claim with respect to the five assets identified above, but denies that claim as to the remainder of the assets at issue.

The court will withhold the entry of a judgment to permit the parties to submit computations consistent with the court's determination of the issues, showing the correct amount of the judgment to be entered herein. The following procedure (which loosely tracks Rule 155 of the U.S. Tax Court's Rules of Practice and Procedure) shall be employed:

1.      On or before August 30, 2013, the parties shall file a status report proposing the judgment amount that should be entered in this case.

2.      Should the parties agree as to the amount of the proposed judgment, they shall so indicate. Agreeing to the entry of such judgment neither signifies agreement with this court's findings and conclusions nor waives any arguments or rights the parties might otherwise have, nor, in particular, impacts upon any party's right to an appeal.

---

[43] In *Brown-Forman*, and later in *Consolidated Freightways*, the Court of Claims distinguished the whiskey maturation facilities in *Brown-Forman* from the greenhouses that were at issue in *Sunnyside Nurseries v. Commissioner of Internal Revenue*, 59 T.C. 113 (1972).  In this regard, the court noted that "no substantial employee activity" took place in the maturation facilities, whereas employees periodically engaged in a broad range of processing activities at the greenhouse.  *See Consol. Freightways*, 620 F.2d at 872; *Brown-Forman*, 400 F.2d at 1272.  In the court's view, the activity here appears to be more closely analogous to that which occurred in the greenhouses – which were held to be buildings.  *Sunnyside Nurseries*, 59 T.C. at 121-22.

3.      If the parties disagree as to the proposed judgment, they shall, in the filing
described in paragraph 1, submit competing proposals for that judgment,
together with an explanation as to why they believe their proposal more
accurately tracks this court's opinion.  On or before September 30, 2013,
the parties may file a response to the proposed judgment and rationale
offered by the other party.

4.      This process shall not be employed to reargue or seek reconsideration of
any of the points resolved by this court's findings and conclusions.  Nor
shall it be used by defendant to pursue setoff or equitable recoupments not
previously pled in this litigation.  *See Principal Life Ins. Co. & Subs. v.
United States*, 76 Fed. Cl. 326 (2007).

**IT IS SO ORDERED.**


                                                    s/Francis M. Allegra
                                                    Francis M. Allegra
                                                    Judge